**BEASLEY** et al. v. **BOND.**

No. 24425.   June 11, 1935.

Rehearing Denied July 16, 1935.

Application for Leave to File Second Petition for Rehearing Denied Sept. 10, 1935.

Allen, Underwood & Canterbury and Paul Pinson, for plaintiff in error Jeff Beasley.

C. A. Summers, Reynolds, Williams & Ridings, and John Barry, for plaintiff in error Muskogee Iron Works.

A. F. Moss and H. R. Young, for defendant in error.

PHELPS, J. The plaintiff obtained a verdict and judgment of $20,000 against the defendants, Jeff Beasley and Muskogee Iron Works, for the death of her husband, whom she alleged lost his life by reason of defendants' negligence.

The deceased was an experienced steel structural worker who was employed by Jeff Beasley, doing business as the Beasley Construction Company. Beasley's crew of five men were engaged in dismantling and taking down a large steel water tank in Miami, Okla. The bottom of the tank rested some 90 feet above the ground, supported by four fabricated steel supports or legs, which extended slightly outward from the vertical as they approached the ground, somewhat as the four legs of an oil well derrick. The work of dismantling, from the top down, had proceeded to the point where the entire tank and the top section of the tower had been taken apart and lowered, leaving remaining the first two "stories" or "bents" of the tower. These bents, as they are called, are horizontal supporting iron beams, running from leg to leg, and supporting said legs and holding them rigid. The sections of the upright legs appear to have been joined together at the places where the horizontal beams (bents) were fastened onto said legs and to each other.

The work of lowering the various pieces of material was done by means of an engine hoist, pulleys and a gin pole. Such a gin pole as was here used consists of an ordinary wooden or iron pole, the butt of which is fastened to some supporting portion of the structure, with the pole extending vertically upward. Long guy wires or ropes are fastened to the top of the pole, leading outward and downward at a slight angle, and are fastened to objects such as trees, at a considerable distance; this to steady the pole. For the use of those who are working immediately around the pole they have also a "lazy line," a piece of rope which can be utilized as an auxiliary means of controlling its position. One or more pulleys are fastened to the top of the pole and through these pulleys there passes a cable. One end of the cable is fastened on the winch or revolving drum which is operated by the engine on the ground. The other end of the cable is attached to the particular piece of material which is being raised or lowered. The raising or lowering is controlled by the engine.

Shortly before this accident occurred the gin pole was standing vertical on the southwest corner of the remaining portion of the tower. The butt of the pole had been pried off the horizontal girder and was resting in its chain supports some three or four feet below the girder, on the inside of the square formed by the girders, within a few feet of the southwest corner thereof. They were beginning to lower the pole to the next set of girders below, so that when they should get it there they could fasten it upright and use it as a support for the lowering of the pieces of girders from which it had just been removed, and also thereby lower the four sections of the legs between those two girders.

An employee by the name of Spillman was perched on the southwest corner of the remaining portion of the structure, 60 feet from the ground. Near him was the gin pole, fastened in its chain moorings just inside of the corner of the framework with its butt three or four feet below the girders upon which Spillman was sitting. Plaintiff's husband, Bond, had just walked from said southwest corner, over to the southeast corner, and had taken the lazy line with him and tied it to the east girder. Then Bond took his station on the top of the southeast corner, just across from Spillman. The evidence shows that at this time the guy rope running from the top of the pole, out to the east, was not in use. The guy rope running to the south was tied to some object about 150 feet away, but no one was handling it. The guy rope running to the north was fastened to some stationary

object at its north end and was being handled by another employee by the name of Easter. Easter had been "riding" this guy line. By "riding" is meant the act of sitting on the rope when it is desired to tighten or take the slack out of said guy line. For instance, should the pole be leaning to the south it could be made vertical by shortening the length of the north guy line, or sitting on the line. The guy line to the west had been tied to a tree and was being "ridden" by the foreman, Garrett. So the north guy line and the west guy line were being handled by one man each, the south guy line was unmanned, and there was no east guy line. The pole was leaning slightly from the vertical toward the southeast.

It was the custom for the men on top to shout directions to the men on the guy lines. Either Bond, on the top of the southeast corner, or Spillman, on the top of the southwest corner, shouted to Easter, who was on the north guy line, to leave his line and go help Garrett, who was on the west line. Easter left his post on the north line (it being tied) and started to go over and assist Garrett, on the west line. Before he arrived there, however, the line and pole got out of Garrett's control and the top of it fell in a swinging motion toward the southeast. In the meantime Bond had seen what was happening and had descended the southeast leg, on the outside thereof, far enough that his head was underneath the horizontal girder. Since the butt of the pole was three or four feet lower than the south girder, and on the inside thereof, when the pole fell it struck said girder at a point about four feet from its bottom end. It snapped in two at that place, and the top portion whipped around and struck the leg of the tower at the point where Bond was clinging. Either the pole, or a guy line, or the block and tackle struck him and he fell the 60 feet from that position to the ground, killing him instantly.

The evidence revealed that the gin pole was 25 feet long and had been selected by Spillman and Easter, employees of Jeff Beasley, from a bunch of discarded telephone poles belonging to the electric company in Miami. It formerly had been set in the ground to a depth of about four feet, and that portion had become defective or worm-eaten, and the outside of said bottom four feet had been hewn off by Beasley's employees. It was at a point on the pole where it had formerly been under ground that it snapped when it struck the girder. Immediately after the accident it was discovered that the west guy line was untied.

We first consider the appeal of the defendant Jeff Beasley, who urges in his first proposition that no act of negligence was proved and that under the undisputed facts there was no jury question in the case. In presenting this proposition the said defendant contends that plaintiff was confined under the pleadings to three alleged forms of negligence, and that the evidence did not support either of them. The defendant then proceeds to discuss each of the three issues of negligence and thus endeavor, by the process of elimination, to show that the evidence was insufficient under any theory to support a finding of negligence or to merit any instruction thereon to the jury.

Under this plan of attack, defendant first argues that the evidence is not sufficient to sustain a finding of negligence on the theory that the number of employees provided by the master was insufficient to do the work safely. It appears to us that the defendant is in error in assuming that the plaintiff relied wholly in this connection upon the testimony of M. T. Hall, who testified as an expert that five men were too few to handle the instrumentalities in the procedure of lowering the gin pole. The physical facts in the case are much more significant than the testimony of that witness. Only Easter was on the north line and Garrett, the foreman, on the west line. It appears that Garrett was unable to handle his line, and it is obvious that if more men had been employed in handling and controlling the guy lines the pole would not have fallen. Or, on the other hand, if there had been two men on the north guy line and one of them had continued riding it while the other was going to the assistance of Garrett, it is a plausible assumption that the pole would not have fallen; it is not mere speculation to infer that the loosening of the north guy line, resulting in the further tilting of the pole to the south and southeast, increased the strain on Garrett, who thereafter was unable to handle the situation. We do not agree with defendant in the argument that the man who was operating the engine hoist could have tied the cable and gone to the assistance of Garrett and that this conclusively shows that a sufficient number of men were

employed. He had duties to perform at the hoist, and it is beyond doubt that if more men had been available they would have been on the guy lines. At any rate, we think there was sufficient evidence to go to the jury on that issue. We dismiss as untenable the claim that it was incumbent upon Bond and Spillman to descend the legs of the tower, 60 feet, for the purpose of assisting in the immediate task of straightening the pole to a vertical position. They had their own duties to perform at the time and place of the accident, and the evidence shows that they were busily engaged thereat. In fact, Bond had just completed the task of carrying and tying the lazy line to the east girder, thus preventing the pole from falling in the direction of Spillman. Spillman was attending to the pole's moorings. Witness Hall, who had had considerable experience in such matters, testified that there should have been two men on each guy line and that the number of men employed was insufficient. The defendant says that the subject was not one in which expert testimony is permissible and that the conclusion of the witness as to the sufficiency of the number of men employed should not have been permitted. We do not agree. In Independent Material & Supply Co. v. Marshall, 129 Okla. 295, 264 P. 830, in reversing the trial court for excluding the conclusion of a contractor witness to the effect that a roof had been properly installed, we stated:

"In a case where the subject-matter is one with which the experience and common judgment of the jurors are insufficient to enable them to reach a proper conclusion and from the primary facts they cannot determine the ultimate facts or reach the proper conclusion which should be deduced therefrom, there becomes competent, as evidence, the opinion of one who, from study and experience, is an expert in such matters, and the refusal of the court to receive such proffered proof, when clearly competent, is reversible error."

The law requires the master to furnish his employees with a sufficient number of fellow servants to do the work with reasonable safety with the appliances and machinery used, and if such employer fails to discharge this duty, and the employee is injured by reason of this negligence, the employer is liable to the injured employee. Davis v. Ball, 76 Okla. 252, 185 P. 105; Sulzberger & Sons Co. v. Hoover. 46 Okla. 792, 149 P. 887; C., R. I. & P. Ry. Co. v. Ashlock, 36 Okla. 706, 129 P. 726.

A strikingly similar case was before the South Carolina Court in Kell v. Rockhill Fertilizer Co., 116 S. E. 97; A gin pole was being moved; there were two men on one rope, one on another, one rope was tied to some studding, and no one had hold of the other rope. The gin pole fell and swiped Kell, the intestate, off the end of the plate where he was standing. More men were used for the purpose of handling the guy ropes than were used here. Said the court:

"We think the evidence is susceptible of the inference, among others, that the work of realigning the beam and of moving the gin pole were so closely connected in point of time and place as to form virtually one operation. For that operation, there was evidence tending to establish that an inadequate force of hands was supplied. The work of moving the gin pole appears to have been started, the guy ropes unfastened, and the pole thus unsecured, leaned against the plate, without an adequate force to man the guy ropes and to finish the moving. One phase of the master's 'absolute duty is that of seeing that the number of persons employed is sufficient to prevent each of them from being exposed to that class of risk which results from an inadequacy of the force available for the work in hand.' Labatt (1st Ed.) sec. 573. If the fall of the gin pole had been caused by the breaking of a defective guy rope, it would scarcely be doubted that such fact would be some evidence of breach of the master's duty. * * * Here the evidence is open to the inference that the fall of the gin pole was due to failure to furnish for the work in hand an adequate supply of men, which it was as much the duty of the master to provide as the guy ropes. * * * The manner of attempting to move it on the occasion of the injury to plaintiff's intestate without an adequate force of men might reasonably be attributed to the lack of the kind of organization and executive planning and direction it was the master's duty to supply. Whether any such inferences as are suggested in the foregoing discussion should have been drawn by the jury as the triers of the facts is, of course, another matter. But it was, we think, properly a matter for the jury's determination in the light of all the facts and circumstances."

Under defendant's attack by the process of elimination, it is next urged that neither was the evidence sufficient to merit an instruction thereon or to sustain the verdict if said verdict was based upon defendant's failure to erect another gin pole for the removal of the gin pole which was being lowered at the time of the accident. Though defendant admits that negligence may consist of the master's failure to provide a safe and proper method of perform-

ing the work, it is contended that, defendant's evidence having established that the method used for lowering the pole was the method commonly used by constructionists in similar work, the plaintiff's evidence of other or safer methods was inadmissible. The defendant says:

"Assuming that the gin pole could have been and properly should have been lowered by the use of another gin pole, still the evidence discloses that the present method was reasonably safe."

The focal point of inquiry for the purpose of which all such evidence of methods is admitted is that of whether the particular method employed was reasonably safe under the circumstances of the particular case. Our judgment is that a master is not necessarily absolved from negligence liability by showing that he used the method customarily used by others performing similar tasks. The fact that others engaged in the same work used the same method is only some evidence of the safeness of that method. The reasonable safety of the method is the real matter of inquiry, and that others used the same method helps to solve but is not conclusive of the question. It seems to us that evidence of the master's conducting his business in the manner customarily followed by experienced men in the same line of business is conclusive against negligence only if the jury believes that those other men have acted with the required degree of prudence and care in adopting such method. In determining whether the employer exercised said proper degree of care in adopting the particular method of work, it was proper to permit the jury to consider methods other than those used by the defendant, although those other methods were not controlling. In other words, evidence of other methods, be they better or worse than the defendant's methods, was relevant and proper for the purpose of fully understanding all the facts and circumstances in connection with the method of operation. It is difficult for the mind to determine whether any particular method is a safe method without a mental comparison of what was done with that which should or should not have been done. The two may coincide, and then again they may not. Comparison in such instances is necessary. That comparison must be made possible by resort to the imagination or explanation. The latter is preferable. To limit the scope of inquiry solely to the method employed by defendant would be to deny the jury

that familiarity with the subject matter necessary to an intelligent determination of the issue. In this particular we are supported, in the results reached, by Cosden Pipe Line Co. v. Berry, 87 Okla. 237, 210 P. 141, in which this court itself suggested better and safer means of doing the work, Southwestern Portland Cement Co. v. Challen (Tex. Civ. App.) 200 S. W. 213, in which the court said that evidence of a better device than the one used by defendant was admissible so that the jury might have all the facts before it to be considered and weighed in determining whether defendant used due care, and by Fairfield v. Bichler (Mo. App.) 190 S. W. 32, Hughes v. Warman Steel Casting Co. (Cal.) 163 P. 885, and Reynolds v. Woodward Iron Co. (Ala.) 74 S. 360.

Defendant states that:

"It is obvious that the fall of the gin pole was occasioned not by the method of work but by the manner of the execution of the details connected therewith."

The details of the work, in our opinion, are greatly controlled by the method of work employed, hence there is not a sufficient distinction between the two to warrant our serious consideration of this contention. Numerous other similar close distinctions are made by the defendant, which we have considered and believe unnecessary to discuss, due to the fact that they neither set forth exceptions to the controlling rules nor take the present case away from the applicability thereof.

The remaining hypothesis of negligence upon which the defendant argues that the verdict cannot be sustained, and upon which it is contended there was no jury question, is that which is based upon the allegation and evidence concerning the unsoundness of the gin pole. The defendant admits that the evidence is sufficient to raise that issue, but argues that even if the pole was unsound the fact is immaterial for various reasons.

We note the defendant's contentions that: "(1) the gin pole was selected and tested from a pile of poles by the employees themselves"; and "(2) any defect in the pole itself observable by the human eye was as apparent to Bond as to any other employee or to the master himself." We pass them over without further comment than to observe that the pole was not selected by Bond and that Bond had been on the job only a day or two at the time he was killed, and further that the ques-

tion of contributory negligence was properly submitted to the jury in the court's instructions.

The defendant strongly contends that it was not the duty of the master to furnish a gin pole which would stand the lateral strain of a fall, or any other strain of a nature different from that which it was designed to receive and sustain. It is undoubtedly true that where the tool or appliance, the defective condition of which is claimed to have caused the injury, is suitable to the particular use for which it was furnished, liability cannot be fastened on the master for an injury resulting from its unsuitability to some other use for which is not adapted. St. Louis, etc., Ry. Co. v. Hartless, 115 Okla. 38, 241 P. 482. In illustration of this doctrine the defendant says:

"A shovel is furnished to an employee the handle of which meets the requirements of his work. The employee, however, thrusts the handle into a crevice in the rock and throws his weight upon it, it breaks and he is precipitated from a high point and injured. Even though subsequent inspection should develop that the handle was in fact unsound, this could not be charged as negligence against the master so far as the particular injury is concerned."

One of the differences between defendant's illustration and the present case is that in the illustration the servant himself put the tool to its improper use while in the present case the improper lateral strain was conceivably caused by the master, or at least the evidence so authorized the jury to find. In the case of the defective shovel, if the master had directed the employee to thrust the handle into the crevice and throw his weight upon it, the master would be liable if the employee was free from contributory negligence. A master cannot free himself from liability for injuries arising from an improper use of the appliances which he has furnished when that use is directed by him or inadvertently arises by reason of his own negligence. It cannot be contended that the possibility of the pole's falling should not have been anticipated and guarded against; that is the very purpose for which guy lines are provided, and if there were no danger of the pole's falling, there would be no reason for the guy lines nor for the usual precaution of properly manning them. The breaking of the pole was only a link in a rapid succession of events, each event producing the succeeding one. We do not consider it consistent for the master to

argue that he is not responsible for the unsoundness of the pole to withstand the lateral strain when the evidence justified a finding that the lateral strain was caused by the master's own failure to prevent that strain. If this were not true, then the master could excuse himself by arguing that his permitting the pole to get out of control is not the cause of the injury, but that the breaking of the pole was the cause thereof, and then, in his next proposition, that he was not liable on account of the breaking of the pole, because it would not have broken if it had not gotten out of control.

It was to be expected that considerable lateral strain would be placed on the pole in the work being performed. Obviously the pole must incline to some degree in the direction of the load being carried and the evidence shows that on the preceding day the four legs on the top bent of the tower had been lowered and their weights were estimated from 1,750 to 4,000 pounds each. Instead of this fact proving the soundness of the pole, as argued by defendant, it could also be considered as causing the weakening thereof. The foreman had noticed the fact that the bottom four feet of the pole had for some while been standing underground, and was thus subject to becoming water-soaked and worm-eaten at the very place where it broke.

It is the positive duty of the master to use reasonable care in providing safe tools, machinery, and appliances with which to work. Ruemmeli-Braun v. Cahill, 14 Okla. 422, 79 P. 260; Neeley v. Southwestern Cotton Seed Oil Co., 13 Okla. 356, 75 P. 537. And the question as to whether a negligent act involving breach of duty on the part of the master to his servant is the proximate cause of the servant's injury is one of fact for the jury, if there is evidence reasonably tending to prove the same. Cushing Gasoline Co. v. Hutchins, 93 Okla. 13, 219 P. 408.

It should be observed in this connection that in order for the verdict to be sustained by the evidence it is not necessary that the breaking of the pole be the entire cause, the sole cause, of the injury; it is sufficient if it be only a part of the cause, so long as it be proximate. One may commit two or more acts of negligence, neither of which alone would cause the injury, but the combined effect of which would cause it. In such case the defendant may not escape liability by the argumentative process of eliminating, one at a time,

each of the insufficient contributing causes, meanwhile ignoring their total combined effect.

Concluding on this and the other issues of negligence alleged and discussed, we think that the evidence was properly admitted and properly permitted to go to the jury under the court's instructions on all of said issues, and that it reasonably tends to support the verdict. Such being the case, it is by this time fundamental that we will refuse to weigh the evidence for the purpose of disturbing the verdict.

The defendant next contends that the proximate cause of the injury was the order to Easter to leave the north guy rope and go to the assistance of Garrett on the west guy rope; that the order was issued by Bond or Spillman from the top of the tower; that if the order was given by Bond it was contributory negligence, if by Spillman, it was the act of a fellow servant, and that in neither event would the defendant be liable, and consequently the court should have directed a verdict for the defendant or sustained a demurrer to the evidence. Defendant thus argues that the order which caused Easter to give slack in the north guy rope set in motion the whole series of rapidly resulting events, and that hence the proximate cause of the injury is not attributable to defendant's negligence in the other respects alleged.

Plaintiff's witnesses testified that the order was given by Spillman, the fellow servant. Defendant's witnesses testified that it was given by Bond, plaintiff's intestate. To us, it is immaterial which of the two gave the order, since same was a disputed question of fact, for the jury's determination. We agree with plaintiff's argument and authorities admitting the correctness of the law cited by defendant but showing the inapplicability thereof to the present case. Assuming first that the order was given by Spillman, the fellow servant (and the jury was so entitled to believe), and even assuming that this order was the inciting cause of the events eventually leading to the death of Bond, the case of Miller v. Bain, 100 Okla. 178, 229 P. 140, is exactly in point, wherein it was held that:

"Where the master fails in his duty to the injured servant of furnishing reasonably safe premises, machinery or tools, and this failure is the proximate cause of the injury, the fact that the negligence of a fellow servant also commingles with

it as the proximate cause will not exonerate the master from liability."

It was also held in Cushing Gasoline Co. v. Hutchins, 93 Okla. 13, 219 P. 408, that:

"The master is liable for injuries to a servant due to the concurring negligence of the master and a fellow servant in cases where the injury would probably not have occurred but for the negligence of the master."

There was evidence tending to establish three different acts of the master's negligence intervening between the giving of the order and the injury to Bond: Insufficient number of employees, insecure tying and handling of the west guy line, and the defective gin pole,—and, in addition, there was the question of the use of an improper method of doing the work.

If the order was given by Bond, then the principle applies that persons who are placed in a position of sudden peril through the negligence of others are not expected or required to act with the same deliberation, care, and foresight as persons having time to reflect. The pole was standing on the southwest corner and had begun to lean toward Bond. It was obvious to him that Garrett on the west line was having difficulty. It does not well behoove the master to complain that contributory negligence consists of the servant's order which, in the light of foresight and not hindsight, was reasonably calculated at the time and place to remedy the situation already created by the master's negligence. Under the evidence in this case the jury was authorized to believe, if it so desired, that the order was given by Spillman or that the injury was occasioned in spite of the order by Bond or Spillman, instead of by reason thereof. Without quoting from them here, we think in point the cases of Bales v. McConnell, 27 Okla. 407, 112 P. 978. Sandquist v. Telephone Co. (Wash.) 80 P. 539, Colorado Midland Ry. Co. v. Brady (Colo.) 101 P. 62. Certainly there was evidence sufficient to be submitted to the jury's consideration on this issue, and we do not feel justified in disturbing the jury's finding thereon.

We do not desire to lengthen this opinion by a detailed discussion of defendant's next proposition, which urges that the subject was not one for expert testimony and that the witnesses Hall and Garrett were not qualified to testify as experts. We have discussed that phase of the appeal under the defendant's first proposition above. The

work was complicated to a degree authorizing the recepton of expert testimony; the witnesses were qualified by years of experience in the handling and operation of gin poles. The method, construction, and appliances used were, taken together, as much if not more complicated than the framework of a building, and the latter was held proper subject-matter for expert testimony in Henry v. Morris & Co., 42 Okla. 13, 140 P. 413, wherein we held:

"In an action for injuries caused by the negligent construction of the framework of a building, where it is necessary for the jury to understand how it is constructed in order to determine whether it is negligently done, and such framework is so complicated that the jury cannot understand how it is constructed without the testimony of an expert, it is not improper to admit expert testimony; and, in such case, architects, carpenters, and builders, if their experience and observation are shown to be sufficient, are competent to testify."

The next question presented is whether it is prejudicial error for the trial court to permit plaintiff's attorney to interrogate prospective jurors, on their voir dire examination, as to whether they are or have been employed by, connected with or interested in an insurance or casualty company engaged in indemnifying defendants against loss by the recovery of damages in such a case as is being tried at the time. On the voir dire examination attorney for plaintiff asked the jurors the following questions, which were permitted over the objections of defendants:

"Have you ever been interested in any company engaged in indemnifying defendants for injuries such as I have described to you in this connection? How long did you continue to write insurance? With what companies were you connected in the writing of this character of insurance?"

There was no suggestion that the defendants carried insurance, other than whatever inference may have been raised by the questions themselves. In their lengthy briefs counsel have contended themselves with citing decisions involving instances where the jury was either informed by an attorney, or the fact was elicited by evidence, that defendant was insured. In Yoast v. Simms, 122 Okla. 200, 253 P. 504, we held it prejudicial error to make known to the jury the fact that the defendant was indemnified and that hence an insurance company was the real party in interest. But in that case the precise point here under consideration was not involved, nor has it heretofore arisen in this jurisdiction.

We are grateful for a thorough discussion of this question appearing in 56 A. L. R. 1454 et seq. It appears that the overwhelming majority of the courts sustain the right of counsel for plaintiff in a personal injury case, so long as he acts in good faith for the purpose only of ascertaining the qualifications of the jurors, and not for the purpose of informing them that an insurance company is back of the defendant, to interrogate prospective jurors by one form or another of questions, with respect to their interest in, or connection with, indemnity insurance companies. Many courts permit counsel to inquire as to whether the juror is interested in the particular insurance company involved in the case, so long as no mention is made that the defendant actually carries insurance. In permitting this practice, the courts proceed on the theory that if such questioning be interpreted by the jury as an inference that an insurance company is back of the defendant, thus invading the defendant's rights, nevertheless the plaintiff has the equally important right to elicit from the prospective jurors sufficient information that he may intelligently exercise his right of challenge. It is well known that plaintiffs rightfully object to juries composed of men who by the very nature of their business adopt an attitude of mind antagonistic to the payment of such claims as plaintiff is at the time presenting in court. Since perfection is often impossible, the conjecture that defendant may be improperly prejudiced by such voir dire examination is looked upon as merely an unfortunate possibility which, notwithstanding, is not permitted to override the valuable right of plaintiff to try his case before disinterested parties,—a choice of the lesser of two evils. As was said in the Iowa case of Foley v. Cudahy Packing Co., 93 N. W. 284:

"It is common knowledge that many companies and corporations have been formed in this country for the purpose of, and are engaged in the business of, insuring employers of labor against damages growing out of personal injuries sustained by employees. Of necessity such business is carried on by agents, and so it is that in most cities and towns one or more of such agents can be found. It is easy to understand that the interests of such companies lie on the defensive side of cases such as the one at bar. And, if the defendant happen to be insured in some one or more of such companies, the interest becomes a direct and active one. That a defendant in an action

of this character may be insured in some such company is immaterial of itself, but it is manifest that a plaintiff may not desire to have the jury which is to try his case made up, in whole or in part, of agents or employees of such an insurance company. * * * As parties and their counsel cannot be expected to know personally every juror who may be called into the box, an examination sufficiently broad should be permitted to enable the party to determine upon his peremptory challenges."

The theory is, of course, that the plaintiff is entitled to know the relationship between any juror and the party really in interest or in the same class, though not appearing of record, so that he may use the information thus obtained as a guide for the exercising of his challenges. In Rinklin v. Acker, 109 N. Y. S. 125, it was said to be not only the right but the duty of plaintiff's attorney to ask such questions.

Of course, such examination must be made in good faith, to test the qualification of the jurors; it should be conducted, so far as possible, in such mode and at such time that it will not prejudice jurors, otherwise qualified, against the right of either party; the object and purpose of the law in the matter is to purge juries of incompetent and disqualified persons as to that particular trial, and so prevent bias and prejudice from inducing an improper verdict, and this right ought not to be denied. But for equally just reasons such right ought to be so exercised and asserted as not to prejudice those who are not disqualified against either party to the suit; and for this reason trial courts and counsel should always be careful in ascertaining the facts as to such disqualifications. and any attempt to get before the jury the fact that parties other than the litigants will be injured or benefited by the verdict, for the purpose of biasing or prejudicing the jury, and not for the purpose of ascertaining the jurors' fitness to serve on the trial, is highly reprehensible, and should not for a moment be tolerated, either by the trial or the appellate court. The matter rests largely within the discretion of the trial judge. If, under the circumstances of the case, the question is calculated to prejudice the defendant before the jury, the trial court should exercise its discretionary power so as to remove the prejudice and insure a fair trial; this must be left largely to the presiding judge, who has ample power to prevent any injustice to the parties litigating before him, and

whose power should be used fully for this purpose, and his rulings will not be reviewed unless there is a clear and unmistakable abuse. 56 A.L.R. 1465.

Defendant also complains of improper cross-examination of witnesses, and of improper closing argument by counsel for the plaintiff. We have examined these parts of the record, and, considering said contentions without merit, decline to discuss them here.

In the voluminous brief of defendant, error is predicated upon claimed irregularity in the instructions given and in refusing certain instructions requested by defendant. These so-called irregularities are based upon the issues hereinbefore discussed. It is unnecessary to lengthen this opinion with a detailed discussion thereof. The instructions as a whole define the issues with accuracy and clarity and in some instances were more favorable to the defendant than the law requires. The cases cited in defendant's brief were sufficient in themselves to inform the interested parties of what our ruling would necessarily be, and the occasion at hand does not justify the further enlightenment of the general public on principles so often heretofore announced that their repetition here would serve no good purpose.

We now consider the defense of the Muskogee Iron Works, which defendant by proper grounds and method of appeal presents the proposition that the evidence fails to show the relationship of master and servant between it and the deceased and that said evidence indisputably shows as a matter of law that Beasley was an independent contractor, under which circumstance the iron works is not responsible in damages for injury to his servant The plaintiff does not seriously deny that the outward appearance of things would indicate Beasley to be an independent contractor, but contends, first, that the contract was merely a subterfuge to hide the real relationship of master and servant, and secondly, that even if it be conceded that Beasley was an independent contractor, the iron works would nevertheless be liable on account of the rule that the statutory duty of furnishing safe appliances for work is undelegable to an independent contractor.

This puts before us the necessity of reviewing the evidence in this connection. The iron works had a written contract with the city of Miami to construct for said city an airplane hangar and as part of the consideration to be received by the iron

works the city gave them this water tank and tower. The iron works was to dismantle and remove the tower, and keep the material and allow the city a credit of $500 therefor, against the construction price of the hangar.

Subsequently, the Beasley Construction Company, which was a trade name for Jeff Beasley, made a written agreement with the Muskogee Iron Works whereunder for the lump sum of $800 Beasley was to dismantle the tank and tower and load its parts on cars in Miami for shipment.

Beasley had worked as an employee of the Muskogee Iron Works, as its construction superintendent, until about five years before this accident, when he quit work for the iron works and started in business for himself. Thereafter it seems the iron works did little or no construction work of its own and had no construction superintendent, although it did bid on and accept such work, subletting it and furnishing the material therefor. The iron works sublet the most of these contracts to Beasley, but some to other contractors. Beasley also performed construction work for concerns other than the Muskogee Iron Works, in this and other states.

Beasley hired, paid, and discharged his own employees, including plaintiff's intestate. On pay days he forwarded his own check to the foreman for the lump sum of the pay roll. The foreman received the check, cashed it, and paid the employees. Beasley maintained a desk of his own in the building of the Muskogee Iron Works for the transaction of his business, and also another office in his home. He did not pay rent therefor. But the Towner Machinery Company also maintained an office in said building free of rent, in return for "pushing" the sale of road machinery manufactured by the iron works. The Resisco Engineering Company also maintained an office in the building, and paid rent. A Mr. Wiley, treasurer of the Muskogee Iron Works, with the permission of Beasley to sign Beasley's name on pay roll checks, a few times made out said checks for him and paid workmen their wages, as a favor to Beasley. On those occasions Wiley made notations of the checks he had written and placed them on Beasley's desk. Beasley sometimes had the stenographer of the iron works do certain typewriting for him when he was in the office. His wife also did some of his stenographic work.

Beasley stored some of his material in the iron works' material yard and some of it at his home. He had bought some of it from the iron works, but they did not furnish any material or appliances used in this job. It was owned and shipped by rail and hauled by truck from Muskogee to Miami by Beasley. The Muskogee Iron Works had not advanced to Beasley any funds for the prosecution of this work or for any other job for which he contracted with them; he straightened up accounts with them about every 60 days. He drew no salary from the iron works. He was personally at Miami a few days while this work was going on, but apparently left the bulk of the supervision to his foreman, Garrett. There is no evidence that any representative or employee of the Muskogee Iron Works was present at any time where the work was being performed, or that any attempt was made by the iron works to control, supervise or direct the work, or any phase thereof, in the slightest degree.

After extended thought on the matter, we are unable to agree with plaintiff that the foregoing serves as a reasonable basis for the inference that the contract was a mere subterfuge hiding the relationship of master and servant. If there were other facts tending to prove bad faith, then of course such facts as officing in the same room or building, using the same stenographic and clerical help, and the past relationship of the parties, would all be evidence tending to the establishment of bad faith. But, standing alone, they do not constitute it, nor would the jury be authorized to infer it. At the most, if not rounded out by other evidence, they could give rise to nothing stronger than a suspicion or conjecture. These mere conjectures cannot overcome positive evidence of the relationship of independent contractor and contractee, and they do not take the place of the plaintiff's necessary proof of the relationship of master and servant, nor relieve the plaintiff of that burden. In Bokoshe Smokeless Coal Co. v. Morehead, 34 Okla. 424, 126 P. 1033, an independent contractor was operating the company's mine. Plaintiff, who was subsequently injured, applied to the company's superintendent for employment and was by him sent to the independent contractor, who employed him. The employees of the independent contractor drew their wages several times from the company's office as a matter of convenience. The independent contractor borrowed and used some of the company's material and appliances in the mine; the company's superintendent was at the mine frequently and at one time of-

fered a suggestion with reference to the repair of an engine. Those facts were held insufficient to show that the contract was a subterfuge. Nor can we attribute bad faith to the iron works by asserting that the motive for making of the contract was to save itself from loss in such cases, for that is a legitimate and permissible reason for the making of such contracts.

An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer except as to the result of the work. Producers Lumber Co. v. Butler, 87 Okla. 172, 209 P. 738. Our language in Riverland Oil Co. v. Chisholm, 143 Okla. 120, 287 P. 379, seems peculiarly appropriate here:

"The evidence is without contradiction that the wrench pole was part of the drilling company's equipment: was raised and attached to the rig by men employed and paid by that company; that no person having any connection with the defendant corporation was present when this was done, neither was anybody connected with this defendant present at the place or directing the drilling operations when the accident occurred; and the defendant under the contract had no right to direct or control the doing of these things. Under all the facts presented by the evidence in this case, and upon which there is no material conflict, it is not shown that plaintiff received his injury by the negligence of this defendant, its servants or employees. Under the circumstances, the case became one for the court, and therefore the court erred in refusing defendant's request for an instructed verdict."

Plaintiff contends that regardless of the foregoing, and even if it be conceded that deceased was an employee of an independent contractor, the Muskogee Iron Works is nevertheless liable on the theory that a statutory duty may not be delegated to an independent contractor. In this connection the plaintiff has reference to sections 10886 to 10889, O. S. 1931, for the protection of labor. The pertinent portions of said sections are:

"All * * * mechanical contrivances erected * * * by any person, firm or corporation for use in the * * * removal * * * of any * * * steel tank * * * shall be erected and constructed in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to life and limb of any person or persons employed or engaged thereon, or

passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon. * * *" Section 10886.

"Any contractor or other person having charge of the * * * removal * * * of any * * * steel tank within the provisions of the three preceding sections shall comply with the terms thereof. * * *" Section 10889.

One may not escape liability by delegating to an independent contractor a duty imposed by statute or ordinance. But it first becomes necessary to determine whether the statute fits the case, whether any duty was thus imposed by the statute on the Muskogee Iron Works. Many states have statutes designed for the general purpose of protecting labor against injuries received from being forced to work with improper appliances and in unsafe places. But in all of the many cases which we have examined we find that the question of to whom the statute applies is governed by the wording of the statute and that the courts uniformly refuse to extend the field of liability beyond the plain terms of the statute itself. In fact, as will be seen below, some courts reach the same result as our decision herein, though construing statutes which on their face would seem to include the owner as well as the contractor. Section 10889 in plain, obvious and unmistakable language defines just who shall be charged with the duty of providing safe appliances. The last two words of the phrase "any contractor or other person **having charge**," being given their plain and obvious meaning, necessarily lead to the conclusion that the duty was intended to be placed on the person having charge of the work at hand, in this case Beasley. By no stretch of the imagination can we conceive of the Muskogee Iron Works, in a distant city and having no representative on the ground or in control of this work, or interested therein except as to the outcome, as "having charge" of the removal of the tank. Though it was to become the property of the iron works, they no more had charge of its dismantling and removal than any person who buys goods or material at a distance and contracts with another to bring it to him. Since the servant of an independent contractor is not a servant of the contractee, the contractee is not liable for injuries to such servant caused by the negligence of the contractor, unless the contractee has retained direction and control of the work (Chas. T. Derr Const. Co. v. Gelruth, 29 Okla. 538, 120 P. 253), or furnishes the machinery and

appliances (Slick Oil Co. v. Coffey, 72 Okla. 32, 177 P. 915), or unless the negligence consists in a duty which cannot be delegated (Derr Const. Co. v. Gelruth, supra). But "the rule is not affected by a statute making it the duty of owners, contractors, and subcontractors, engaged in designated work to take designated precautions for the safety of their employees, such statutes being intended to apply only to that member of the class enumerated who was engaged in the work designated at the time when the injury occurred." 39 C. J. 1342.

In the case of Leet v. Block, 106 N. E. 373, 20 A. L. R. 654, the Indiana court construed a like situation and statute wherein the language of the act provided that:

"It is hereby made the duty of all owners, contractors, subcontractors * * * engaged in the * * * construction * * * of any building * * *·to see and to require that all * * * rope, * * * appliances. * * * contrivances * * * are carefully selected * * *and, similarly, it shall be the duty of all owners, * * * contractors, subcontractors, and all other persons having charge of, or responsible for, any work * * * to use every device, care and precaution. * * *" Acts 1911, c. 236, sec. 4.

It is noticed that the language of that act is much broader in the description of persons charged with the duty of furnishing safe devices than is our statute. Yet the court held that the act did not deprive owners of the benefit of the defense of independent contractor, even though the work was performed on the owner's property. Said the court:

"The act evinces no legislative intent to impose a duty of testing and inspecting appliances except on the particular owner, contractor, or subcontractor who has 'charge of', or is 'responsible for,' the work, etc., in question. While the act does materially change the common-law duties of the employer and imposes on him greater obligations in relation to the safety of employees, it was not the legislative purpose to make the owner liable for an injury occurring to an employee of a contractor or subcontractor because of the latter's negligence, in cases where the owner lets a contract for the particular work, without reserving any control over the manner of the work or the character of appliances used. It was the purpose of the enactment to fix a higher standard of care on the person having the particular work in charge, whether such person be owner, contractor, subcontractor, or other person, but the language of the statute, considered as a whole, precludes the theory of any intent to eliminate the doctrine of independent contractor."

The Indiana court went further than is necessary for the purpose of this case. There is no question here involved or decided as to whether the contractor may escape the liability imposed by the statute, by delegating this duty to a subcontractor.

The Oregon court, in Tamm v. Sauset, 135 P. 868, L. R. A. 1917D, 988, held that:

"A contractor who has sublet the work, and is not actively directing it is not liable for injury to an employee of a subcontractor due to defective appliances, under an * * * act which provides that owners, contractors, or persons whatsoever engaged in certain activities, shall see that the materials employed and appliances used are carefully selected, inspected, and tested."

The court said that the evident intent of the statute was to hold responsible only that member of the class enumerated who was engaged in the undertaking or enterprise, and that it lays the responsibility at the door of the person having the work in charge, and that the high standard of care imposed by the statute was an additional reason why its effect should be circumscribed to that particular person having control of the instrumentalities and individuals employed.

Our construction of this statute is in accord with the results announced by the research reflected in the annotation in L. R. A. 1917D, 991, also by the following cases: Gibbons v. Chapin, 147 Ill. App. 575; Lawton v. Morgan (Ore.) 131 P. 314, 134 P. 1037; Mackey v. Layfayette L. & T. Co. (Ind. App.) 121 N. E. 682; Prest-O-Lite Co. v. Skeel (Ind.) 106 N. E. 365; Switow v. McDougal (Ind.) 111 N. E. 3; Bedford Stone Co. v. Henninger (Ind.) 121 N. E. 277; Wingert v. Krakuer, 87 N. Y. S. 261; Antes v. Watkins, 98 N. Y. S. 519; Kennedy v. Kaufman (N. J.) 91 A. 99; Hess v. Bernheimer, etc., Brewing Co. (N. Y.) 114 N. E. 808. These are cases whereunder the owner was under no duty and made no effort to furnish appliances for the contractor, under the terms of the contract or in the prosecution of the work. In all such cases statutes similar to ours were discussed. Nor do we perceive any reason why in the interests of justice the statute should apply to a case where the contractee has no opportunity whatever, as in the present case, to direct and control the details of the work, or the manner of appliances used. It should be observed, in conclusion, that this is not within the class of cases where there is involved the public duty of safeguarding third parties from the dangers arising from

excavations, falling objects, and the like.

There is not sufficient competent evidence to sustain the verdict as to the Muskogee Iron Works.

The judgment against Jeff Beasley, doing business as the Beasley Construction Company, is affirmed. The judgment against Muskogee Iron Works is reversed and remanded, with directions to enter judgment for that defendant.

McNEILL, C. J., OSBORN, V. C. J., and BAYLESS and CORN, JJ., concur.