Emma Wheeler, Appellee, v. Abraham Rudek, Appellant.

Gen. No. 43,558.

284

Opinion filed March 11, 1946. Released for publication March 25, 1946.

SAMUEL LEVIN, of Chicago, for appellant.

LOUIS G. DAVIDSON and JOSEPH D. RYAN, both of Chicago, for appellee.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

Plaintiff brought an action against Abraham Rudek and Robert Lee to recover damages for personal injuries sustained through the claimed negligence of Robert Lee who was in the employ of defendant Rudek, in driving an automobile which collided with plaintiff's automobile, as a result of which plaintiff was injured. Before the case was submitted to the jury it was dismissed as to Lee and there was a ver-

dict and judgment in plaintiff's favor for $7,500. Rudek appeals.

The record discloses that about 12:45 P. M., August 2, 1943, plaintiff was driving her Plymouth automobile west in 90th street and Lee was driving defendant's automobile south in Phillips avenue, Chicago. The cars collided in the intersection, defendant's automobile striking plaintiff's at about the middle of the right side, the car was tipped over and plaintiff injured. The complaint was in 2 counts, the first charged general negligence and the second wanton misconduct on the part of Lee, the driver of defendant's automobile. There were no buildings at or near the intersection but considerable tall weeds which somewhat obstructed the view of each driver. The weeds were cut some distance back on the northeast corner of the intersection. There were no witnesses to the accident except the drivers of the 2 automobiles.

Plaintiff, a married woman 60 years of age, testified that she lived at 8405 Luella avenue; that before the accident her health, eyesight and hearing were good; that she did all her own housework; that she had been driving an automobile for 15 or 16 years nearly every day; that on the day of the accident she was driving her husband's car which was a 1939 Plymouth; that just before the accident she went to the post office at 92nd and Exchange avenue; that it was a bright, clear day and she went to buy a ''Federal sticker'' but was told at the post office that they did not have any in stock and to come back in about an hour; so she decided to go to the home of her nephew and niece between 89th and 90th streets about 3 blocks west of the place of the accident; that she was in no hurry. As she was driving west on 90th street just prior to the accident her speed was from 15 to 16 miles an hour; that as she approached Phillips avenue she slowed down to about 12 miles an hour because of the tall weeds which were as high as the top of an automobile;

that they were cut about 10 or 15 feet back from the corner; that as she approached Phillips avenue she looked south and saw no traffic coming, and then north and saw a car coming south about a quarter of a block away—about 150 feet north of the intersection; that the block just north of the intersection was a long one, about 800 feet; that when she saw defendant's car approaching from the north she thought it was perfectly safe for her to continue across the intersection; that she started across and increased her speed to about 15 miles an hour; that when she was about halfway across the intersection she again looked and saw defendant's car and realized it was approaching very fast, about 50 to 75 feet from the intersection. She pulled to the left and increased her speed and about half of her automobile was west of the west curb line when defendant's car suddenly turned to the southwest and struck her automobile on the right side between the front and rear doors. That defendant's car was traveling about 35 miles an hour just before the impact, although it may have slowed down a little; that when the cars collided plaintiff's automobile was thrown sideways over on to the southwest corner of the intersection on its left side.

Robert Lee called as an adverse witness while he was still a defendant, testified that he was driving the Chevrolet south on Phillips avenue in the west half of the street. (The evidence shows that the roadway of each street was about 32 or 33 feet wide.) There were no buildings at any of the corners of the intersection but weeds were permitted to grow very high; that the block just north of 90th street on Phillips avenue was about 800 feet long, the block east of Phillips avenue was a short block about 300 feet; that he was 15 years old April 6, 1943; that the accident occurred the following August 2; that he was delivering and picking up clothing for defendant at the time of the accident and was alone in the automobile; that when he finished

delivering the items in the car his day's work would be done; that as he approached 90th street he was driving about 20 to 25 miles an hour but slowed down about 25 feet before he reached the intersection and at that time he had not seen the other car; that when he reached about the north side of 90th street he was driving about 5 miles an hour; he then saw the other car; that his car was in the intersection when he first saw the other car coming; at that time he was going about 2 miles an hour and the other car about 20 to 25; that he did not remember whether he looked to see if there were any skid marks after the accident; that he did not remember what he told the police just after the accident.

Afterward Lee was called as a witness and testified in his own behalf that he was attending school prior to August, 1943, the time of the accident. That the school term ended the early part of June and then he went to work for Mr. Rudek about 2 weeks after the school closed; that he drove the automobile in delivering and picking up clothing for Mr. Rudek, who was a tailor in the cleaning, dyeing and pressing business; that the witness had driven his father's car for about 2 years prior to the accident; that he worked every day except Sunday from 9 to 2; that he would then go to lunch; that he was on one of his regular routes at the time of the accident; that he had been going about 25 miles an hour on Phillips avenue, some distance north of 90th street; that he slowed down about 25 feet north of 90th street and was going about 10 miles an hour; the reason was that his view was obstructed by the weeds; that when he first saw Mrs. Wheeler's car it was about 3 or 4 feet east of the east curb of Phillips avenue going west, north of the center line of 90th street; that he had a driver's license which he received, he believed, May 11, 1943; that when he first saw Mrs. Wheeler's car it was traveling about 25 miles an hour and his car was going from 8 to 10 miles an hour; that

when he saw that her car was not slowing down he turned to the right at the intersection and put on his brake when the collision occurred. That she did not sound any horn or slow down; that she did not swerve or change her direction until just before the impact; that at no time prior to the time his car reached the north edge of 90th street did he apply his brake suddenly; that when his car came to a stop it was about 8 feet west of the west edge of Phillips avenue in the north lane of 90th street; that he saw officer Herndon shortly after the accident and denied that he had been asked some of the questions as shown by the report made by the officer, or made some of the answers as there shown; that when the officer asked him how fast he was driving at the time of the accident he said 25 miles an hour.

On cross-examination he testified that after the trial adjourned over the week-end, counsel for defendant had read over the statement as shown by the police and that the statement bore his signature.

Police officers came to the scene of the accident in response to a police radio call shortly after the occurrence. Officer Herndon testified that the Plymouth car, in which plaintiff was riding, was lying on its left side on the southwest corner of the intersection, facing in a northwesterly direction; that the Chevrolet was standing on 90th street with the front end facing the upturned automobile and about 4 or 5 feet from it, facing in a southwesterly direction; that about half of the Chevrolet was south of the center line of 90th street. That plaintiff's car, which was upturned, was damaged on the right side at the doors; that defendant's automobile was damaged on the left front, including the left front fender, head lamp and bumper. The front of the Chevrolet was "all pushed back." That the officers examined the streets and found skid marks extending in a southwesterly direction starting north of the curbline of 90th street about 28 to 30 feet

long; that they went straight for a few feet and then there was a curve in a southwesterly direction leading up to the rear wheels of the Chevrolet car, "they stopped at the rear wheels of the Chevrolet;" that the officers had a conversation with the young man (Lee) and showed him the skid marks; that the witness and his partner went to the hospital where they talked to the injured woman (plaintiff) and that his partner tried to take a statement from her. He further testified that he took a statement from the young man, Lee; that he wrote down everything that was said and Lee signed it. The statement is in the record from which it appears that Lee was 15 years of age, employed by defendant, Rudek, in delivering, and had been in such employment about 1 month; that he was driving south on Phillips avenue about 25 miles per hour; that he did not see the westbound automobile on account of the weeds; that the car was about 10 or 15 feet in front of him when he first saw it and he then applied his brakes.

Officer Johnson of the Accident Prevention Bureau testified that he came to the scene of the accident shortly after it occurred and described the positions and conditions of the 2 automobiles; that I "Noticed the skidmarks that the car going south had made." They were about 25 to 30 feet in length; that they commenced about 10 or 15 feet north of the north curb of 90th street.

Counsel for defendant contends that it was reversibly erroneous for the court to permit counsel for plaintiff to interrogate prospective jurors as to their interest in any company that makes a practice of investigating or defending cases such as the one at bar and also whether they had any financial interest in any such company or whether they had any relatives or close friends associated with such company or financially interested. Counsel for both sides cite the same authorities, viz., *Smithers v. Henriquez,* 368 Ill. 588; *Edwards v. Hill-Thomas Lime Co.,* 378 Ill. 180; *Ka-*

*vanaugh v. Parret,* 379 Ill. 273 and *Moore v. Edmonds,* 384 Ill. 535. Counsel for plaintiff contend that under the rule of law announced in these cases the questions were proper, while on the other side, counsel for defendant says that under the rule announced in those cases the questions were improper and prejudicial.

The jurors were accepted in panels of 4 and each panel was asked 2 questions and made an answer to each. The questions were: "Q. Have any of you ever had any interest in or been in any way affiliated with any company that makes a practice of investigating and defending cases of this kind; or do you have any financial interest in such a company as that? The Jurors: A. No. Q. Do any of you have any close friends or relatives associated with any company of that kind, or financially interested in it? The Jurors: A. No." When any prospective juror was excused from the panels and a new one called, the questions were repeated to such persons.

Before the jury were called, the parties appeared before the court in chambers where there was quite a lengthy hearing. Plaintiff there presented an affidavit in support of her motion for leave to ask the two questions of the prospective jurors. It set up on information and belief that defendant, Rudek, owned the automobile involved in the collision and held an insurance policy issued by the Commercial Casualty Insurance Company in the ordinary form insuring against such an accident as the one in question; that the company had employed counsel for defendant who took charge of the case; that it employed numerous persons in its office in Chicago and had many other persons to act as investigators, agents and brokers in Cook county, and that the affiant had reasonable grounds for believing that some of those persons might be on the panel for jurors; that the panel may also include close friends and relatives of those persons employed by the insurance company, etc. After the affidavit was filed, coun-

sel for defendant asked leave to interrogate plaintiff with reference to the averments made by her in the affidavit which request was denied. Counsel himself was then sworn and stated the nature of the claim; that Rudek had a liability insurance policy with the Commercial Casualty Company to the extent of $5,000; that counsel represented the company and Rudek and that so far as counsel was advised (after examining the jurors' cards) there was no one on the jury panel who was a stockholder or agent of the insurance company or financially interested and that so far as he was able to learn, he believed that no one on the panel knows anyone connected with the stockholders of the company. The court said he would permit the 2 questions to be asked.

In the *Smithers* case (368 Ill. 588) affirming 287 Ill. App. 95, an affidavit was filed before the trial and a hearing took place out of the presence of the jury. The affidavit stated that affiant had been informed and believed that the suit was defended by the American Insurance Company, of Boston, Massachusetts, etc., and it was sought to ask the prospective jurors if they had any financial interest in the insurance company or any interest which would prejudice them. Over objection the court permitted the question to be asked. The judgment was affirmed by this court and the Supreme court. The Supreme court there said, (p. 591): "The affidavit made a sufficient showing to warrant the granting of a proper inquiry. While the filing of an affidavit and a preliminary determination of the right to question the jurors as to their qualifications in any respect is unnecessary, it is a commendable practice where it is claimed the subject matter is prejudicial. . . .

[592] "The proposed inquiry was disclosed to the court and opposing counsel in chambers and fully discussed before any attempt was made to interrogate the jurors. The record does not show the employment of

any subterfuge to inform the jury that an insurance company was defending the suit, or any other improper motive or misconduct on the part of plaintiff's counsel. From the record it appears the inquiry was for the purpose of exercising the right of challenge." The court continuing discusses former opinions of our Supreme court touching the same question, one of which is *Kenny v. Marquette Cement Manf. Co.*, 243 Ill. 396, and quoted the following from that case: "While the jury were being impaneled appellee was permitted to ask certain jurymen, 'Are you acquainted with any of the officers or agents of the Aetna Insurance Company?' This question was improper, and the objection to it should have been sustained by the trial court. . . . We do not think, however, taking into consideration the entire record, that reversible error was committed in permitting this question to be asked."

In the *Edwards* case (378 Ill. 180) the first panel of 4 jurors were asked: "Do you own any stock, or is any member of your family employed by the Massachusetts Bonding & Insurance Company?" And counsel asked the second panel: "Do any of you own any stock, or are you employed, or have you been employed, or are any close relatives employed in the Massachusetts Bonding & Insurance Company?" And the final panel: "Do any of you gentlemen own any stock, or are you employed by, or do you have any close relatives employed by the Massachusetts Bonding & Insurance Company?" The court there said: "No affidavit was filed by counsel for appellee, and no showing was made giving any reason why it was necessary to ask the questions proposed. The record indicates that he simply made the request, orally, before the judge in chambers." The judgments of the Appellate court and the trial court were reversed. The court there pointed out that on a former trial the jury had disagreed on the question of liability.

In the *Kavanaugh* case (379 Ill. 273), at the com-
mencement of the trial plaintiff's counsel filed with
the judge in chambers, an affidavit stating: "Upon in-
formation and belief" that defendant was insured in
the Union Auto Indemnity Association of Blooming-
ton, Illinois. A counter affidavit was filed by the sec-
retary and executive manager of the insurance com-
pany: "that an examination of the records of the
company disclosed that none of the jurors, naming
them, were policyholders, stockholders, agents, em-
ployees or in any way or manner interested financially
or otherwise in the affairs of the insurance company."
The trial judge permitted the question to be asked and
the Supreme court in reversing the judgment of the
trial and Appellate courts, and remanding the cause
for a new trial, discussed the authorities, holding that
under the facts in the case it was prejudically erro-
neous to permit the question to be asked.

In the *Moore* case, (384 Ill. 535) prior to the inter-
rogation of the prospective jurors, plaintiff filed an
affidavit alleging on information and belief that de-
fendant carried insurance with the Underwriters at
Lloyds of London and that it was defending the action
which was for personal injuries and that plaintiff's
interests would be prejudiced unless his counsel were
allowed to inquire of prospective jurors as to their
financial interest in the Underwriters at Lloyds of
London. Defendants' counsel objected and interposed
a motion supported by his affidavit to restrain the in-
terrogation requested in which it was stated that none
of the jurors could possibly have any financial interest
with the insurer and defendants further moved that
before plaintiff's counsel be allowed to interrogate the
prospective jurors that he asked each of them their
residence, employment and occupation before putting
the question. The court in affirming the judgment of
this court (316 Ill. App. 453, Abst.) which sustained
the verdict and judgment of the trial court held that

plaintiff had a right, in good faith, to interrogate prospective jurors as to their or their relatives' possible connection with, or interest in, liability insurance companies, even though such inquiries may develop a suspicion in the minds of the jury that the defendant was protected by insurance. The court there discusses the former opinions of the Supreme court, including the *Smithers, Edwards,* and other cases and said the question "must be asked in good faith and not merely for the purpose of bringing home to the jurors the fact that a defendant is insured" and continuing quoted from *Beasley v. Pond,* 173 Okla. 355 and *Dowd-Feder, Inc. v. Truesdell,* 130 Ohio St. 530.

 Upon a consideration of the entire record we hold that under the law as announced in the *Smithers* and *Moore* cases, the asking of the questions complained of was not reversibly erroneous.

 Defendant contends that the court erred in submitting the case to the jury on the count charging wilful misconduct on the part of defendant and that the court erred in not sustaining defendant's motion made at the close of all the evidence for a directed verdict as to this count. It is the law that when there is no evidence to sustain such count the motion must be sustained. *Greene v. Noonan,* 372 Ill. 286. And counsel says that "A wilful or wanton injury must have been intentional or at least the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others." Some years ago, in passing on a similar question, we said in *Schoenbacher v. Kadetsky,* 290 Ill. App. 28, that "We may surmise a case of an automobile collision at a street intersection where the defendant intended to injure the plaintiff, but those cases do not happen in actual practice. We have never had any such case in this court. The term 'wilful' as used in such cases implies intent or purpose, while the term 'wanton' expresses a reckless disregard of consequences. *Trucking Co. v. Fairchild,* 128 Ohio St. 519." What is such conduct

that amounts to a reckless disregard for the safety of others depends upon the facts in each particular case. In *Walldren Ex. Co. v. Krug*, 291 Ill. 472, a leading case, the court said: "Whether the negligent conduct of a defendant which has resulted in injury to another amounted to wantonness is a question of fact to be determined by the jury, if there is any evidence in the record fairly tending to show such a gross want of care as indicates a willful disregard of consequences or a willingness to inflict injury." And continuing the court said (p. 479) quoting from *Lake Shore and Mich. So. Ry. Co. v. Bodemer*, 139 Ill. 596: "What degree of negligence the law considers equivalent to a willful or wanton act is as hard to define as negligence itself." In the instant case we are of opinion that the question whether plaintiff had sustained the allegations of the second count was for the jury. There was evidence, as hereinbefore mentioned, tending to show that plaintiff was driving her car with due care and that defendant's automobile was driven at such a speed, in view of the surrounding circumstances, including the tall weeds at the intersection, and the skid marks, as would warrant the jury in finding that defendant's automobile was operated in a reckless disregard of plaintiff's rights.

As to the contention that the verdict is against the manifest weight of the evidence: upon a consideration of all the evidence we are unable to say that the verdict rendered by the jury is against the manifest weight of the evidence. The jury saw and heard the witnesses testify and observed their demeanor on the stand. Their verdict was approved by the trial judge who also saw and heard the witnesses testify and therefore they were in a much better position to determine the truth of the matter involved than are we, sitting in a court of review where we have but the printed page before us. In these circumstances we are not warranted, under the law, in disturbing the verdict and judgment.

Counsel for defendant further say that under the statute, Par. 165, ch. 95½, Ill. Rev. Stat. 1945 [Jones Ill. Stats. Ann. 85.197], motor vehicles traveling upon public highways shall give the right of way to vehicles approaching along intersecting highways from the right and shall have the right of way over those approaching from the left. The right mentioned in the statute is not an absolute but a qualified right. *Heidler Lumber Co. v. Wilson & Bennett Mfg. Co.*, 243 Ill. App. 89; *Bentley v. Olson*, 324 Ill. App. 281, and other cases cited in these two opinions. We there pointed out the qualification as to the right of way mentioned in the statute as announced in an opinion by Judge CARDOZO in *Ward v. Clark*, 232 N. Y. 195, which we held was a proper construction of the statute.

It is next contended that the verdict is excessive and counsel says: "It is quite clear that the jury awarded punitive damages and not compensatory damages and that it felt justified in so doing in view of the wilful, count." We think neither of these contentions can be sustained. It is clear the damages allowed were awarded to compensate plaintiff. Four instructions were given, 2 at the request of plaintiff and 2 requested by defendant, which told the jury that in fixing the damages, in case they found for plaintiff they should name such a sum as would be fair and just compensation for the injuries plaintiff sustained. Prior to the accident plaintiff did her own housework, including cleaning, washing, ironing and cooking. Right after the accident she was taken to the hospital where it was found the little finger on her left hand was cut to the bone; she was otherwise injured and was given morphine. She complained of severe pain in her left arm, head and back. There were bruises on her left arm which was swollen and a deformity of the left elbow. The left hand was swollen twice its normal size. An X-ray was taken, which showed that there

was a complete dislocation of the left elbow joint. Other injuries, and the treatment given were mentioned; she remained in the hospital about 15 days during which time she was in pain and on the 10th day in the hospital there was an operation performed and there was found a comminuted fracture of the radius of the left wrist, a dislocation of the ulna and a cut finger and several fragments of the bone were removed. She continued under the doctor's care during the remainder of 1943. An X-ray was taken in October, 1943, which showed a large mass of new bone, etc. The attending physician testified that he last examined her arm several months before the trial and there was a definite limitation of motion which he considered was permanent. Plaintiff could not bend her elbow half way up at the time of the trial which was begun March 21, 1945—more than a year and 7 months after the accident. Three fingers on her left hand were stiff at that time. Dr. Turner testified that at the request of plaintiff's counsel he examined plaintiff on February 14, 1945 and objectively he found the patient had a "limitation of motion in flexion of the lateral three fingers, . . . . In flexion her arm was limited to about eighty-eighty-five degrees;" that the palm upward was totally absent. The evidence further shows that plaintiff's expenses were about $700 and that she suffered considerable pain on account of the injuries. We think we would not be warranted in disturbing the verdict and judgment on the ground that the judgment is excessive.

■ Defendant further contends that the court erred in giving plaintiff's instruction 1 and in refusing defendant's offered instructions 1, 2 and 3. Plaintiff's instruction 1 summarized the allegations of the complaint as to the negligence of defendant and authorized a verdict of guilty if the jury believed from the evidence that defendant was guilty of one or more

of the acts charged. A somewhat similar instruction was approved in *Goldberg v. Capitol Freight Lines,* 382 Ill. 283.

By refused instruction 1, defendant sought to have the court tell the jury that they were not bound to believe facts simply because a witness stated them to be so, etc. This is a stock instruction and was covered by another instruction given. Refused instructions 2 and 3 were on the meaning of the statute hereinbefore mentioned, on the right of way of automobiles approaching an intersection. From what we have heretofore said these instructions were properly refused. *Bentley v. Olson,* 324 Ill. App. 281; *Heidler Lumber Co. v. Wilson and Bennett Mfg. Co.,* 243 Ill. App. 89.

Before affirming the judgment we think we ought to say that the contention of counsel for plaintiff that ''The court will not review alleged errors concerning instructions not set forth in the brief and argument,'' is not the procedure now followed in this Appellate court district. *Crisler v. Zahart,* 318 Ill. App. 220, which opinion on this question was approved by the 9 judges of this district.

The judgment of the Superior court of Cook county is affirmed.

*Judgment affirmed.*

MATCHETT, P. J., concurs.

NIEMEYER, J., dissents: The opinion of the court ignores certain facts stressed by defendant which distinguish this case from *Moore v. Edmonds,* 384 Ill. 535. In the *Moore* case defendants' attorney moved that before plaintiff's counsel be permitted to examine the jurors as to their alleged interest, connection or affiliation with the Underwriters at Lloyds of London, he be directed to interrogate the jurors concerning their residence, employment and occupation, and determine whether any of the jurors individually were con-

nected with any company or association, and the kind and nature of the business of the company, corporation or association with which any juror was shown to be connected before inquiring of the jurors whether or not they were connected and affiliated with or interested in any corporation or association engaged in the insurance business. The trial court directed plaintiff's counsel to first ask the jurors about their occupations, and pointed out that if the jurors appeared acceptable, counsel would then have "a right to ask them as to their friends, relatives and associates, with reference to any insurance company." This method of examination was followed. Plaintiff's counsel asked about 200 questions in examining the jury, including questions similar to those involved here. These questions being answered in the negative, the jurors were asked if they had any connection with the Underwriters at Lloyds of London. The Supreme court said: "The record discloses good faith in seeking to ask the questions and, also, painstaking efforts by plaintiff's counsel, when permitted so to do, to interrogate the jurors in a manner eminently fair to defendants as well as to his own client." Three justices of the court concurred in the result reached in the majority opinion "because the defendant's attorney invited the interrogation of jurors, now objected to, by suggesting that after they had been generally examined they could be collectively interrogated concerning financial interest, connection or affiliation with the Underwriters at Lloyds. . . . and hence he is in no position to raise the objection that such examination improperly disclosed that an insurance company was involved; and likewise it would negative the absence of good faith upon the part of plaintiff's attorney." These justices, however, objected that the majority opinion was not based upon the foregoing proposition, but extended "the rule laid down in *Smithers v. Henriquez,* 368 Ill. 588, so that for

practical purposes the door is now open for the plaintiff upon voir dire examination of jurors to fully disclose an insurance company's interest.''

In the instant case there was no extended or general examination of the jurors by plaintiff's counsel, and in the examination of some of the jurors there is nothing in the record to indicate a probability that the jurors might be in any way affiliated with or interested financially or otherwise in a company ''that makes a practice of investigating and defending cases of this kind.'' Two jurors were not asked as to their occupations. Plaintiff's counsel seeks to explain this omission by claiming that, having previously questioned these jurors in another case, it should be presumed that he there inquired as to the juror's occupations and had full information concerning them. It could equally be presumed that he then asked them as to their connection with and interest in companies investigating and defending cases of this kind. The method of examination employed by plaintiff's counsel unduly emphasized the jurors' connection, if any, with insurance companies. In the *Moore* case the court mentions the fact that one of the defendants was engaged in the insurance business and that the business of all the defendants was of a hazardous nature, and said: ''If the jurors reached the conclusion from the questions asked that defendants were insured,—and we think the inference fair despite the fact that use of the word 'insurance' was consistently avoided in the questions attacked,—knowledge that one defendant was an insurance broker and that the three defendants were engaged in an extraordinarily hazardous business would undoubtedly have induced the same inference.'' Here no such inference from the business or occupation of the defendant Rudek could arise. He was a retail cleaner and dyer, collecting and delivering garments, sending them out to be cleaned and dyed but doing the pressing in his place of business. In the absence of the questions propounded to the jurors they

could reasonably be in doubt as to whether he was insured, or if insured for an amount sufficient to cover the damages claimed, notwithstanding the general practice of automobile owners to carry insurance. Where the automobile owner is fully insured, as in the *Moore* case, the insurer and not the insured suffers by the disclosure to the jury of the carrying of insurance. Where, as here, the defendant's liability is only partially covered by insurance, he suffers a real wrong from the recognized liberality of jurors with the money of insurance companies in fixing liability and assessing damages when the carrying of insurance is unduly emphasized or needlessly made known to the jury. Here the testimony as to the occurrences was in direct conflict. There were two occurrence witnesses: plaintiff, in her own behalf, and defendant's driver—first called by plaintiff for cross-examination while a party to the action, and later called by defendant in his behalf. Although police officers gave testimony as to skid marks and the location of the cars after the accident, tending to support plaintiff's testimony, the evidence is close and the question of liability is solely for the jury. For these reasons I consider the manner of examination of the jurors as to their connection with or interest in insurance companies reversibly erroneous.