## TOMS v. STATE.

No. A-11511. Jan. 2, 1952.

(239 P. 2d 812.)

Landrith & Friel, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and James P. Garrett, Asst. Atty. Gen., for defendant in error.

BRETT, P. J. Plaintiff in error, Daniel H. Toms, defendant below was charged in the municipal court of the city of Tulsa, Oklahoma, by information with the offense of driving his automobile while drunk, on or about April 8, 1950, at a "point in 31st and Lewis Streets in the city of Tulsa, Oklahoma", the same being a public highway, all of which, it was alleged, he did in violation of § 93, Title 47 O. S. 1941. The defendant was tried by a jury which found him guilty but left the punishment to be fixed by the trial court. The trial court entered judgment and sentence on July 15, 1950, fixing the penalty at 60 days in the county jail and a fine of $150. Motion for new trial was overruled on said date, and judgment and sentence entered accordingly. Notice of intention to appeal was made as by law provided, and the trial court entered its order extending time to perfect appeal 30 days, to make and serve case-made. Thereafter on August

14, 1950, an order further extending time to make and serve case-made was entered extending time therefor for 30 days. On September 13, 1950, the trial court entered an order extending time 60 days to "make and serve case-made *on appeal* to the Criminal Court of Appeals". This order was made on the 60th day from the entry of judgment and sentence. Thereafter on October 13, 1950, an order was made and entered extending time to 60 days from September 13, 1950, "in which to file an appeal to the Criminal Court of Appeals of the State of Oklahoma". The appeal was lodged herein on November 8, 1950. On this state of the record the state filed its motion to dismiss contending that, the order of September 13, 1950, did not extend the time for filing of the appeal, and therefore the order dated October 13, was a nullity. This court has repeatedly held, the Criminal Court of Appeals is reluctant to dismiss appeals in criminal cases and will not do so on technicalities. Lewis v. State, 90 Okla. Cr. 137, 211 P. 2d 295; Cruse v. State, 86 Okla. Cr. 83, 187 P. 2d 235, 236. It is apparent from the record that the trial court's orders extending time were all made and entered at such time, as allowed by law or lawful extension thereof, and was sufficient to continue the trial court's jurisdiction. The state attempts to assert, however, the trial court lost jurisdiction in its order of September 13, 1950, by use of the term "on appeal", which it contends was indicative of a lack of jurisdiction and indicated the case was already on appeal and no longer within the jurisdiction of the trial court. We are of the opinion, the expression "on appeal" is so inconsistent with the clearly expressed intent of the trial court to retain jurisdiction and extend time as to indicate, that the expression "on appeal" was an unconscious or typographical error. Where the trial court does an act indicative of clear intention to relinquish or extinguish jurisdiction, its jurisdiction will cease, but such intention must be clear, and inconsistent with intention to retain jurisdiction. More specifically, the appeal will not be dismissed because of the technical or erroneous use of language employed in an order extending time, making it appear jurisdiction had already passed to the appellate court, where the intent of the trial court to retain jurisdiction, within the time allowed by law, can otherwise be clearly ascertained by its acts and expressions inconsistent with intent to relinquish jurisdiction. We are of the opinion that the orders of the trial court extending time herein were sufficient to continue jurisdiction in the trial court, even though its use of the term "on appeal" was not technically correct. Moreover, it is apparent to us, that the order of September 13, reading "in which to make and serve case-made on appeal to the Criminal Court of Appeals" was intended to read, "and appeal to the Criminal Court of Appeals". The order of October 13 extending time from September 13, 1950, for 60 days from September 13 was intended to, and did, clarify the trial court's intention in its order of September 13, 1950. The state's contention in this regard is highly technical and will therefore be overruled.

The facts in the case are not complicated. They are substantially as hereinafter related. The defendant, a resident of Jenks, Oklahoma, admits that he and his brother Bennie, whom he had not seen for a long time, had drunk one glass of 3.2 beer and 3 glasses or bottles of beer from 11:30 a.m., until about 3:30 p. m. He admitted he was driving his 2-door 1949 Ford automobile north on Lewis Street and collided his car with a Nash automobile being driven in an eastwardly direction, which ran a stop line at the west intersection of Lewis and 31st streets in Tulsa, Oklahoma, at about 3:35 p.m., on April 8, 1950. The information alleged that the defendant was intoxicated and in such condition was driving his automobile, colliding the same with the Nash automobile. The collision was with such force, as to seriously damage the two automobiles and injure a woman occupant of the Nash automobile. The state's proof in relation to the time of the collision and occurrences preceding and following it was as follows: John Engler, a photographer, identified state's exhibits Nos. 1 and 2, as pictures of the intersection at Lewis and 31st streets, taken immediately following the collision and disclosing skidmarks. They were admitted over the defendant's objection.

Mr. Bruce Collier and Earl Peterson testified that about one-half or one-fourth of a mile on Lewis Street from 31st street south of the intersection, a maroon Ford car driven by a man in a blue shirt with a male passenger passed him, going north at an estimated speed of 60 miles per hour, that the Ford car veered from side to side and his rear left wheels went off of the pavement a few minutes later. They testified they saw the defendant at the intersection of 31st and Lewis streets and the defendant's car was practically demolished. The defendant's car was maroon in color, and he was wearing a blue shirt. Moreover, the record does not disclose any other such car or driver passed them in the interim between the time it was first seen and when they arrived at the collision. Furthermore the state's case disclosed that there was a clearance view to the left of the defendant's left as he approached the intersection of Lewis and 31st streets of 360 feet, that the defendant in applying his brakes left skidmarks on the pavement of 196 feet to the point of impact with the Nash car.

Mr. I. H. Van Horn, Police Officer Murray Smith and Police Officer Ed Erwin who investigated the collision immediately thereafter, all testified that the defendant had been drinking. These officers testified that the defendant's speech was thick and the defendant was wobbly or staggered.

Mr. M. T. Hill, traffic officer of the Tulsa police department, testified that the defendant had a moderate odor of alcohol on his breath and it smelled like bay rum. He testified that he had a normal color but his eyes were bloodshot and he swayed. Though his speech was fairly good and his tongue was not thick and the defendant could walk a straight line, nevertheless he swayed in doing so. The officer said the defendant could pick up coins. Moreover, he could touch the end of his nose with the ends of his fingers, after extending his arms and with his eyes shut. Further, the witness testified, over objection, that he had made a breathometer test of the defendant's breath. The record shows that the test was made voluntarily and with the defendant's consent as heretofore related. Officer Hill testified further in relation to the Harger Breathometer or drunkometer test, which he demonstrated. He testified that he had studied the use of this instrument at Northwestern University 28 hours, and had had 150 to 200 hours subsequent experience in testing the instrumentality. He explained the defendant breathed into a balloon, inflating it. Thereafter the air passed from the balloon into a solution of permanganate of potash and into a vial, "where it mixes with a solution and changes color from purple to this color", which "shows the percentage of alcohol in a man's body". Thereafter the air, he said, passed through another vial where it is sealed and later delivered to Dr. Beddo, who makes a chemical analysis of such specimens to determine the actual alcoholic blood content of the subject of the test. In this instance the test showed the breath of the defendant to contain .16% alcohol. The witness further testified this conclusion was reached according to certain charts prepared by Dr. Beddo. Moreover the witness testified the defendant voluntarily gave a specimen of his urine, which likewise was delivered to Dr. Beddo for chemical analysis. On cross-examination, Mr. Hill further said that according to the charts when one whose breath measured as much as .15% alcohol he was under the influence of alcohol and therefore an unsafe driver. Furthermore he testified the relation varies in different individuals up to the level of .15%.

Dr. Beddo, who was qualified as a physician, and to make chemical analyses, testified extensively but in substance that the breathometer and urine tests would show the alcoholic blood content, if any, in an individual's blood stream. He further testified these tests, such as the R. N. Harger Drunkometer, had been approved by the American Medical Association, the Commissioner of National Safety, the Federal Bureau of Investigation, by many courts, and 12 of the states by statute. See in this connection, Chemical Tests for Alcohol in Traffic Law En-

forcement, Glenn C. Forrester, author, page 30. Moreover, he explained the charts used in connection with such tests and stated in his opinion they were accurate. He testified that these tests and charts as approved by the American Medical Association and other agencies, established the fact that an individual with .15% by weight of alcoholic blood content would be an unsafe driver. But, Dr. Beddo, stated some authorities place the degree of alcoholic blood content for unsafe driving at less than .15%. He also testified in relation to the urine clinical analysis test, as a means of accurately ascertaining the alcoholic blood content of an individual. He further testified that a human body will burn about one-third of an ounce of alcohol an hour, or 0.015% blood alcohol per hour. He testified that the defendant's tests both as to his breath and urine, showed .16% alcohol blood content, and revealed he was an unsafe driver. It is interesting to note, the accuracy of the breath test is proved by the urine test. Such is the case in blood and saliva tests, if taken at or near the same time as the urine and breath tests. Dr. Beddo likewise testified that when an individual reaches the .15% level both as to his breath or his urine, he is unable to control his reactions and is an unsafe driver, notwithstanding, he may be able to perform all the physical tests such a walking a straight line and picking up coins. The foregoing analysis of the evidence constitutes a substantial basis for consideration of the conviction and the defendant's objection thereto.

Dr. Beddo did not explain the basis for the .15% level of alcoholic blood content as the basis for the presumption of intoxication. But, in Medicolegal Problems by Samuel A. Levinson, M. D., Ph. D., prepared for the Committees of the Institute of Medicine and the Chicago Bar Association, published in 1948 by J. B. Lippincott Company, a symposium, we find a treatise prepared by Clarence Muehlberger, Ph. D., entitled Chemical Tests for Alcoholic Intoxication. On pages 223, 224, 225, Dr. Muehlberger makes the following observation:

"My friends of the legal profession often point with alarm to the degree of variability in humans, which I have estimated at about plus or minue .10 to .15 per cent. It would be very desirable if we could evolve a mathematical formula which would encompass all mankind, but this seems very far in the future. Nevertheless, our courts have a right to demand the best evidence which can be produced in order that justice may be done. And with all allowances for human variability, it seems that there can be little question that chemical tests for intoxication do serve as an extremely important adjunct to physical indications. They not only serve to convict the guilty, but which may be more important, they protect the innocent.

"With reference to the operation of a motor vehicle upon the public highways, the recommendations of the National Safety Council and the American Medical Association seem to provide an admirable answer in the safe interpretation of chemical tests. Their recommendations, as embodied in the statutes of such states as Indiana, New York, Maine and Oregon, classify cases into three categories, as follows:

"1. Where there is less than 0.05 per cent alcohol in the blood or equivalent amounts in other body fluids or breath, the subject shall be presumed to be not under the influence of alcohol so far as the operation of a motor vehicle is concerned.

"2. Where there is 0.15 per cent or more alcohol in the blood, or equivalent amounts in other body fluids or breath, the subject is presumed to be under the influence of alcohol, as far as the operation of a motor vehicle is concerned.

"3. Where there is between .05 per cent and 0.15 per cent alcohol in the blood, or equivalent amounts in other body fluids or breath, the results of such tests may be received along with other tests or observations for consideration by the court or jury as bearing upon the question of alcohol influence.

"This arrangement adequately safeguards the interests of the person who has been properly temperate in his drinking. Impairment sufficient to adversely in-

fluence driving ability is demonstrated quite clearly in the average individual at alcohol concentrations of 0.09 per cent to 0.11 per cent in the blood. Thus, the establishment of 0.15 per cent as the presumption limit gives a considerable degree of grace for individual variation, which protects the most resistant or tolerant driver and also makes allowances for the mild antidotal effect of coffee, caffeine, benzedrine, and similar stimulants which might have been taken.

"While these quantities of alcohol seem almost negligible, it should be realized that for the average adult it requires at least two twelve-ounce bottles of beer or two one-ounce glasses of 100-proof whiskey to bring an individual up to the lower blood limit of 0.05 per cent alcohol. To reach the presumption level of 0.15 per cent alcohol in the blood, the average man must consume six to eight bottles of beer or six to eight ounces of whiskey."

It has been held that proof of the alcoholic content of a sample of blood taken from a person whose intoxication at the time was in question, is admissible in evidence notwithstanding the existence of differences among individuals in the toleration of alcohol. Kuroske v. Aetna Life Ins. Co., 234 Wis. 394, 291 N.W. 384, 127 A.L.R. 1505. See also in this connection Rocky Mountain Law Review, pages 91, 92, an article entitled, Body Fluid Tests for Intoxication, wherein the following appears:

"The American Medical Association has stated that the percentage of alcohol in the blood is a reliable index of the degree of intoxication, especially when it is considered along with other external symptoms."

See Chemical Test Case Law, supra, pp. 6, 7, 8, Science v. Guesswork, by Robert L. Donigan, counsel for the Traffic Institute of Northwestern University. The foregoing affords a more enlightened basis for an intelligent consideration of the defendant's objections to the conviction had herein.

The defendant's first proposition urged in his brief is, expert opinions on the ultimate fact in issue are inadmissible as invading the province of the jury where the jury is equally qualified as the expert to draw conclusions. The defendant urges in support hereof that the state predicated its case almost entirely upon the credence of the conclusions and opinions of Police Officer M. T. Hill and Dr. Beddo, which he contends constituted an invasion of the province of the jury. This contention is not entirely accurate for it overlooks the evidence of Mr. Collier, Mr. Peterson, Mr. Van Horn and Officer Hill's observation as to the defendant's condition immediately after the collision, as well as the evidence of Officers Smith and Erwin to the effect that the defendant was under the influence of intoxicating liquor. It is fundamental that if the jury elected to believe this sworn testimony as against the defendant's lame, uncorroborated defense of non-intoxication, it was their province so to do. Such evidence was entirely sufficient to support the verdict of guilty. We are in no position to say upon which predicate the jury based its verdict, the physical observations of the experienced officers or the breathometer and urine tests. We can only conclude from the record that there was some competent evidence upon which the verdict could be based, excluding the breathometer test and the urine analysis test. Before this court can reverse a case for insufficiency of evidence, there must be no competent evidence in the record upon which the verdict could be based. Rule v. State, 84 Okla. Cr. 347, 182 P. 2d 525; Ritter v. State, 84 Okla. Cr. 418, 183 P. 2d 257. Notwithstanding the foregoing, the contention of the defendant arrested our attention. The defendant however overlooks the proposition that the evidence of Officer Hill and Dr. Beddo was offered as the testimony of experts. Both Officer Hill and Dr. Beddo were qualified as experts. The record does not disclose any attack upon their qualifications as experts. Their conclusion based upon the drunkometer and urine tests was that, the defendant's blood contained .16% alcohol by weight, and that a person with that amount of alcohol in his blood would

be in a state of intoxication. Therefore, the defendant's contention that the conclusions of such experts as Officer Hill and Dr. Beddo invades the province of the jury, is untenable. A case specifically in point on the admissibility of experts' testimony under the conditions herein involved, though concerning the blood test of one charged with driving while under the influence of intoxicating liquor, is that of People v. Tucker, 1948, 88 Cal. App. 2d 333, 198 P. 2d 941, 944. Therein the rule relative to the admissibility of such evidence and conclusions of experts based thereon, the rule was correctly stated as follows:

"It is the general rule that expert testimony is admissible where the conclusions to be drawn by the jury depend on the existence of facts which are not common knowledge and which are peculiarly within the knowledge of men whose experience or study enables them to speak with authority thereon, and in those cases in which the conclusions to be drawn from the facts stated, as well as knowledge of the facts themselves, depend upon professional or scientific knowledge or skill not within the range ·of ordinary training or intelligence. In such cases not only the facts but the conclusions to which they lead, may be testified to by qualified experts. Of course any such opinion may be accepted or rejected by the jury. * * * The law makes no distinction in weighing evidence between expert testimony and evidence of other character. * * * It is for the jury and not the reviewing court to determine the weight to be given such evidence."

This rule is in accord with the opinion of this court previously expressed, Holt v. State, 84 Okla. Cr. 283, 181 P. 2d 573, 581, wherein we said:

"Inasmuch as there are some facts and principles which may be raised as indisputable in all subjects, the law permits persons who are expert in their several callings to express their opinions upon subjects with which their studies and occupations have made them familiar, even though they have no acquaintance with the particular occurrence under inquiry."

See, also, Beasley v. Bond, 173 Okla. 355, 48 P. 2d 299. In Lawrence v. City of Los Angeles, 53 Cal. App. 2d 6, 127 P. 2d 931, it was said at page 932:

"Petitioner urges three propositions for reversal of the judgment, which will be stated and answered hereunder seriatim.

"First: The trial court committed prejudicial error in receiving in evidence opinions of doctors that petitioner's husband was at the time of his death under the influence of an intoxicating beverage, which opinions were based solely upon the results of tests of the blood of decedent taken from him after his death.

"This proposition is untenable. Opinions of qualified medical doctors as to whether an individual was intoxicated or not predicated upon the percentage of alcohol in the individual's blood, though not conclusive, are admissible when there is a proper preliminary showing that the blood tests upon which such opinions have been predicated have been properly conducted (State v. Duguid, 50 Ariz. 276, 72 P. 2d 435, 437; Kuroske v. Aetna Life Ins. Co., 234 Wis. 394, 291 N.W. 384, 387, 127 A.L.R. 1505; Commonwealth v. Capalbo, 308 Mass. 376, 32 N.E. 2d 225, 228.

"In the present case no objection was made that a preliminary foundation had not been laid for the admission of the testimony of Drs. Louis J. Gogol and J. Dryden Davenport. Therefore, the trial court properly permitted them to testify that in their opinion decedent was intoxicated at the time of his death, since an analysis of his blood disclosed that it contained 0.28% ethanol."

In a footnote the California District Court of Appeals said:

"It appears to be the consensus of the medical profession that when the blood alcohol concentrate of the driver of an automobile is 0.15% (by weight) such fact is conclusive evidence that the driver is under the influence of alcohol. (Committee on Tests for Intoxication of the National Safety Council, Chemical Tests for Intoxication (1938) p. 5; see also for .an excellent discussion of the subject

'The Medico-Legal Aspects of the Blood Test to Determine Intoxication,' by Professors Mason Ladd and Robert B. Gibson, The Iowa Law Review, January, 1939, Vol. XXIV, No. 2, p. 191, et seq.; and 'Alcohol in Relation to Traffic Accidents,' by Richard L. Holcomb, Vol. III, No. 12, The Journal of the American Medical Association, September 17, 1938, p. 1076.)"

In connection with this note is a graph, pictorially and explanatorily, indicating that .05% alcoholic blood content by weight makes the average person delighted and 'devilish, .15% makes him dizzy and delirious, .20% to .30% makes him dazed and dejected, .30% to .40%, dead drunk and .50%, dead. In Natwick v. Moyer, 177 Or. 486, 163 P. 2d 936, 940, that court said in a similar situation involving a blood test:

"Other grounds of objection to the testimony of Captain Porro urged in the defendants' brief are without merit. One contention is that the test offends against the rule that a witness will not be permitted to express an opinion on the merits of the case. See Cosgrove v. Tracey, 156 Or. 1, 9, 65 [64] P. 2d 1321. An expert witness, testifying as to the result of a blood test, may say that a given quantity of alcohol found in the blood of a particular individual indicates intoxication in a greater or less degree. But, since his testimony is based solely on the result of the blood test, he may not, of course, give his opinion that the individual in question was in fact intoxicated. In this particular the testimony of Captain Porro is not objectionable. On the other hand, the competency of such evidence is not at all impaired because some persons yield more readily than other to the deleterious effects of intoxicants. That fact may lessen the weight of the expert testimony with the jury, but it cannot be employed to exclude it. It is but other evidence to be considered in determining the question of intoxication vel non."

In State v. Duguid, Ariz., supra [50 Ariz. 276, 72 P. 2d 439.], the defendant complained of the admission of the results of a urine test to show intoxication. That court said:

"His urinalysis showed 'two milligrams of ethyl alcohol per cubic centimeter of urine.' Doctor Goss explained how this much alcohol affects persons as follows: 'There are four ordinary standards which we use to determine drunkenness, depending upon the amount of alcohol which we recover in the urine or blood. This ranges from one to four or five milligrams per cubic centimeter. One milligram, a patient may be drunk, but decently so. Two milligrams, distinctly drunk. Three milligrams, usually drunk and disorderly. And four milligrams or more, dead drunk.' "

See further, State v. Hauer, 231 Iowa 348, 1 N.W. 2d 91; State v. Werling, 234 Iowa 1109, 13 N.W. 2d 318; Commonwealth v. Capalbo, supra.

In the case at bar the alcoholic content of both the defendant's breath and his urine was a matter not within the ordinary training or intelligence of the average juror, hence not only the facts, but the conclusions in relation thereto, were matters of professional or scientific knowledge or skill, concerning which qualified experts are permitted to give testimony. We are therefore of the opinion that this contention is without merit.

The defendant's second contention is that the urine and breath tests taken at 5:00 p.m., following the collision at 3:30 p.m., were too remote in point of time to be admissible in evidence to show alcoholic blood content at the time of the collision. This contention appears to us to be without merit on its face particularly in view of the evidence that the defendant offered no proof in support of the contention and, further in view of the fact that Dr. Beddo testified a human body will burn about "1/3 of an ounce of alcohol an hour, or about .015% of blood alcohol per hour". Dr. Beddo's conclusion that the test being made at 5:00 p.m., and the defendant not having taken any alcohol from the time of the collison at

3:30 p.m., and the time the tests were made that the defendant would be more drunk at 3:30 p.m., than he was at 5:00 p.m., and no doubt this fact formed the basis for Dr. Beddo's conclusion. This seems sound to us. Such being true, the longer the test was delayed the more favorable the situation would become for the subject. We believe this conclusion would be obvious.

Defendant's third contention is that the drunkometer and urine analysis tests for determining whether the defendant was under the influence of intoxicating liquor have not gained such standing in scientific recognition for infallibility as to justify admission of expert testimony adduced from such tests. This contention is without support in the record. Dr. Beddo testified that the Harger Breathometer was recognized as a proper test by different medical schools and colleges, by the American Medical Association, the Commissioner of National Safety, and the Federal Bureau of Investigation. See in this connection also, Chemical Tests for Alcohol in Traffic Law Enforcement, by Forrester, at page 30. Moreover, Dr. Beddo said it had at that time been adopted by 12 states as an accurate means of determining a person's condition as to their being under the influence of intoxicants. Moreover he further testified that the medical profession and related agencies heretofore enumerated recognize urine, blood, and saliva tests as also an accurate method of determining the alcoholic blood content of the subject suspected of being intoxicated. In this connection for a discussion on this point see, People v. Bobczyk, 343 Ill. App. 504, 99 N.E. 2d 567, 570, wherein after stating the identical question as to scientific recognition, said:

"The question here presented has never been ruled on by the court of review in Illinois.

"Since the decision in People v. Morse, 325 Mich. 270, 38 N.W. 2d 322, Northwestern University (Illinois) published a treatise on the subject of chemical tests to determine intoxication. In an exhaustive study of the decisions and legal literature upon this subject the author, Robert Donigan, a member of the Chicago Bar, shows the need of a scientific means of determining with certainty the degree of intoxication resulting from the amount of alcohol in the blood, in order to eliminate guesswork and speculation, particularly in so-called 'borderline cases.' He says, at page 15, 'Scientists through experiments on humans and animals have established the fact that blood alcohol concentration parallels the degree to which a person may be under the influence of such alcohol, i. e., the amount of alcohol in the blood stream is an accurate index as to the amount of alcohol in the brain or other nerve centers of the body. Thus, to obtain and analyze a sample of blood of the suspect at the time of or immediately after the violation is the next most reliable method of determining to what degree he may be under the influence of intoxicating liquor. Scientists also have established the fact that the amount of alcohol excreted through the kidneys and lungs parallels the amount of alcohol the blood is carrying to the kidneys and the lungs. So by obtaining and analyzing samples of the urine or breath and measuring the amount of alcohol therein, an accurate and reliable estimate of the concentration of alcohol in the circulating blood can be obtained by chemical and mathematical calculations. (See Ladd and Gibson on "Medico-Legal Aspects of the Blood Test to Determine Intoxication," 24 Iowa Law Review 194-200). These latter two methods now are used by a large number of law enforcement agencies.'

"Medical science recognizes sixty pathological conditions which produce symptoms similar to those produced by alcohol, yet the law permits nonexpert lay witnesses to testify to objective symptoms commonly associated with alcoholic intoxication on the theory that sobriety or intoxication are matters of common knowledge. See Suppe v. Sako, 311 Ill. App. 459, 36 N.E. 2d 603; and Cox v. Hrasky, 318 Ill. App. 287, 47 N.E. 2d 728.

"Defendant argues that there is a lack of unanimity in the medical profession as to whether intoxication can be determined by breath. Even so we think this objection goes to the weight of the testimony and does not destroy its admissibility.

The evidence in this case shows that the experts called by the State are eminently qualified in the field in question."

See, also, State v. Duguid, supra. In the comparatively recent case of McKay v. State (Tex. Cr. App.), 235 S.W. 2d 173, 175, that court held such evidence was admissible under conditions such as we have herein involved. However the Texas court did not pass on the question of whether the results of the Harger Breathometer test had been established as a scientific fact. It held that such was not necessary because other competent evidence established the intoxicated condition of the defendant. Such is the situation in the case at bar as hereinbefore pointed out. But in the McKay case as in the case at bar, the defendant had granted permission for the breathometer test to be made. Hence the Texas court held, as did the Illinois Court in People v. Bobczyk, supra, the objection to such evidence "goes to its weight and not to its admissibility". We believe, however, the trial court should instruct the jury that such evidence is not conclusive but shall be accorded such weight as the jury sees fit to give it. We think an accused should not be permitted to consent to a drunkometer and urine test without being subject to its detriment as well as its benefits. We hold under the circumstances of this case the drunkometer evidence was admissible. This court is of the opinion, that we should favor the adoption of scientific methods for crime detection, where the demonstrated accuracy and reliability has become established and recognized. Justice is truth in action, and any instrumentality, which aids justice in ascertainment of truth, should be embraced without delay. But, this decision is not ours to make. We have no legislative powers or duties, but the Legislature within its legislative powers and constitutional limitations may do so, possibly on the theory that it is within its police power to regulate the highways for the protection of the public. We believe, in light of the foregoing, chemical tests by experts of body fluids as blood, urine, breath, spinal fluid, saliva, etc., under varying conditions have been approved as having gained that scientific recognition for infallibility as to be admissible in evidence. In this connection this type of evidence is of a higher quality than truth serum and lie detector tests which were not recognized in Henderson v. State, 94 Okla. Cr. 45, 230 P. 2d 495. See also in this connection, 127 A.L.R. 1513; 159 A.L.R. 209, for an extended discussion on the above point, and citation of authorities in regard thereto. In 159 A.L.R. 209, the editor makes this pertinent observation:

"From the cases generally, it is apparent that, subject to compliance with conditions as to relevancy in point of time, tracing and identification of the specimen, accuracy of the analysis, and qualification of the witness as an expert in the field, there is rather general agreement that where the prosecution in a criminal case seeks to establish the intoxication of the accused, evidence as to the obtaining of a specimen of his body fluid at or near the time in question, evidence as to the alcoholic content of such specimen, as determined by scientific analysis, and expert opinion testimony as to what the presence of the ascertained amount of alcohol in the blood, urine, or other body fluid of an individual indicates with respect to the matter of such individual's intoxication or sobriety, is ordinarily admissible as relevant and competent evidence upon the issue of intoxication, at least where the accused voluntarily furnished the specimen for the test, or submitted without objection to its taking."

Again we say such approval of such tests generally does not lie within our power to grant, it is legislative not judicial, but in the case at bar the evidence thus obtained was admissible.

The defendant's fourth proposition is in regard to his objection to certain photographs, Exhibits 1 and 2, offered in evidence of the scene of the collision at the intersection of Lewis and 31st streets in Tulsa, Oklahoma. The pictures were taken for the purpose of showing the conditions of the intersection existing at the time of and immediately following the collision. It appears from the rec-

ord the pictures were not posed and that they are a clear representation of the intersection and such was the only purpose of their introduction. Their admissibility was a matter within the trial court's sound discretion. Jackson v. State, 67 Okla. Cr. 422, 94 P. 2d 851; Hudman v. State, 89 Okla. Cr. 160, 205 P. 2d 1175; Langley v. State, 90 Okla. Cr. 310, 213 P. 2d 886. Notwithstanding as stated by the defendant in his brief, "the wrecked automobiles are in the picture, together with a number of bystanders, and automobiles moving in" or near "the intersection", the pictures do portray the intersection clearly and more graphically than a thousand words. In Roberts v. State, 82 Okla. Cr. 75, 166 P. 2d 111, 113, the court said:

"When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things or places."

Under the conditions herein involved the trial court did not abuse its discretion in admitting the photographs in evidence.

The defendant's fourth proposition going to the insufficiency of the evidence has heretofore been considered and disposed of. As heretofore stated, the question of the constitutionality of such evidence being obtained in violation of the rule against self-incrimination is not raised herein. Nevertheless, for those who are interested in the subject, we cite the following: Chemical Test Case Law, supra, pages 27 to 62, Constitutional Issues, Section B, 30, The Privilege Against Self-Incrimination, wherein the treatise cites 8 Wigmore on Evidence, 3rd Edition, page 662, and Prof. Fred E. Inbau, 28 Journal of Criminal Law and Criminology; Dean Ladd, 24 Iowa Law Review, pages 191, 226 (1939), The Medico-Legal Aspects of the Blood Test to Determine Intoxication. Also, Chemical Tests for Alcohol in Traffic Law Enforcement, supra; Compulsory Tests, pages 52 to 70, citing cases. For a discussion on this and all questions herein involved see The Drunken Driver by John C. Grimm, 43 Ohio Opinions, pages 60 to 72, inclusive.

All things considered; especially the fact the collision was precipitated by the driver of the Nash automobile running a stop line, and the further fact of the defendant's prior good citizenship, this being his first offense, and his record of continuous employment, we are of the opinion that the judgment and sentence should be modified to $150 fine and no jail time. As so modified the judgment and sentence is accordingly affirmed.

JONES and POWELL, JJ., concur.