Jack BAYOUTH, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12238.

Criminal Court of Appeals of Oklahoma.

Feb. 29, 1956.

Hickman & Hickman, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Jack Bayouth, plaintiff in error, hereinafter referred to as defendant, was charged by amended information filed in the court of common pleas of Tulsa County with the violation of 21 O.S.A. § 1029, in that, in the words of the information:

"On the 2nd day of December, A.D. 1954, * * * in Tulsa, County, Jack Bayouth * * * did unlawfully, wilfully, wrongfully and knowingly entice Irene Hamilton to commit an act of lewdness with him in the following manner, to-wit: by calling the said Irene Hamilton on the phone and asking her to have sexual intercourse with him and did promise the said Irene Hamilton money if she would have sexual intercourse with him the said Jack Bayouth, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State."

Defendant was tried before a jury and convicted, but his punishment was left to the court, who fixed the penalty at confinement in the county jail for a period of one year, the maximum punishment provided. 21 O.S.1951 § 1031.

Section 1029 of Title 21 O.S.A., provides:

"It shall further be unlawful: * * *

"(b) To solicit, induce, entice, or procure another to commit an act of lewdness, assignation, or prostitution, with himself or herself; * * *

"(d) To aid, abet, or participate in the doing of any of the acts herein prohibited."

And Section 1030 of Title 21 reads:

"The term 'prostitution' as used in this Act [§§ 1028–1031] shall be construed to include the giving or receiving of the body for sexual intercourse for hire, and shall also be construed to include the giving or receiving of the body for indiscriminate sexual intercourse without hire. That the term 'lewdness' shall be construed to include the making of any appointment or engagement for prostitution or lewdness or any act in furtherance of such appointment or engagement."

For reversal counsel set out and argue in their brief some seven specifications of error, which shall have our attention in the order presented.

It is first contended that the court erred in overruling the defendant's demurrer to the amended information and his objection to the introduction of evidence.

This proposition is based upon the assertion that the portion of the Act, Title 21, Section 1029, subsection (b), was unconstitutional and void as not having been within the title to the Act as originally adopted. The title to the Act in question, House Bill 39 of the 1943 Legislature, p. 83, S.L. 1943, reads:

"An Act providing penalties for aiding, abetting, participating in, or providing premises for prostitution or other lewd or indecent acts; and declaring an emergency."

In the body of our opinion in Landrum v. State, 96 Okl.Cr. 356, 359, 255 P.2d 525, 529, we said with reference to House Bill 39 of the 1943 Legislature:

"It will be noted from an examination of the various sections, except those under which the within charge was filed, [also § 1029] that they were in force in the Territory prior to statehood, being adopted from Dakota Territory; but sections 1029 and 1030 were only enacted in 1943. It is significant that the prior provisions though aimed at the suppression of sexual vices were apparently not deemed sufficient to accomplish the overall objective, and hence the enactment of the sections now being considered."

The questions now raised against Sections 1029 and 1030 were not advanced in the Landrum case. Here, counsel say:

"The defendant contends that Section 1029(b) does not come within the

purview of the purposes for which said Act was created; Article 5, Section 57 of the Constitution states: 'Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title. * * *' "

While the argument of counsel possesses merit, see Nelson v. State, Okl.Cr., 288 P. 2d 429, 431, where in paragraphs 4 and 5 of the syllabus we said:

"4. If by any fair intendment the provisions in the body of an act have a necessary and proper connection with the title, and are not incongruous with the title, or without proper connection or relation therewith they are sufficiently covered by the title.

"5. The term 'subject', as used in article 5, § 57, of the Oklahoma Constitution, to the effect that 'Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title,' is to be given a broad and extensive meaning so as to allow the Legislature full scope to include in one act all matters having a logical or natural connection."

But any doubt concerning whether the provisions in question, Section 2 of Chapter 39 House Bill 39, Session Laws 1943, are germane to the subject set out in the heading to the act, would seem to have been removed in that Sections 1029 and 1030 were incorporated in the Oklahoma Statutes, 1951, and adopted by the Legislature as the code by House Bill 698, enacted by the 1953 Legislature and appearing as Chapter 5 of Title 75, Session Laws 1953. See Atlas Life Ins. Co. v. Rose, 196 Okl. 592, 166 P.2d 1011, 1014; Atchley v. Board of Barber Examiners of State, 208 Okl. 453, 257 P.2d 302; Ex parte Haley, 202 Okl. 101, 210 P.2d 653, 12 A.L.R.2d 416 and note; Brown v. State, Okl.Cr., 266 P.2d 988; In re Opinion of Justices, 1943, 244 Ala. 384, 13 So.2d 762 and cases cited.

In Brown v. State, supra, [266 P.2d 990], in the body of the opinion we said:

"And of course where the body is broader than the title, then the Act is unconstitutional as to such provisions. This is a correct statement of principle, *although any deficiency in the title would not now invalidate the section since its adoption as a part of the Codes of 1941 and 1951.*"

The latter portion of such statement was not included in any paragraph of the syllabus in the Brown case; that point was not involved in a determination of the issues raised in the case, and there amounted to dictum.

In the Alabama case cited above, the court said:

"The incorporation of acts into the code and the adoption thereof by the legislature cures all defects in the same that may have intervened in original enactment." [244 Ala. 384, 13 So. 2d 764.]

If such re-enactment of a law by a legislature cures one defect that may have been considered unconstitutional, we see no reason why it would not cure a defect as now urged against Sections 1029 and 1030 of Title 21. The public welfare requires that the law be settled as much as may be. At all events, the question raised has been passed on by our Supreme Court in the cases cited, and for the sake of uniformity of decision, we adhere to the law in such cases announced on the subject in question. Hurst v. Pitman, 90 Okl.Cr. 329, 213 P.2d 877; Eubanks v. Cole, 4 Okl.Cr. 25, 109 P. 736; State ex rel. Attorney General v. Davenport, 125 Okl. 1, 256 P. 340.

It is next urged that the court erred in overruling defendant's demurrer to the evidence.

Counsel base this proposition on the matters urged in support of the first proposition, and further upon the meaning of the word "entice". It is said that it was necessary that the State establish that "Mrs. Hamilton yielded assent as a result of enticement."

At this point a summary of the evidence is necessary.

Irene Hamilton, the prosecuting witness, testified that she was 36 years old, was the mother of five children and lived at 522 West Cameron, Tulsa, with her husband. She said that she first saw defendant on Friday, December 3, 1954 at 15 min-

utes before 10 o'clock in the morning at the bus stop at the corner of Cameron and Denver, Tulsa. That the voice was that of a man who had telephoned her at 9 o'clock that morning and said: "I want to take you to work". She assented and he said that he would call back in thirty minutes. In the meantime witness telephoned Sgt. Raford at the police station. She had previously been in touch with the police department concerning some man who commenced telephoning her early in the year, some time in February, the voice being of the same man who telephoned her the morning of December 3, 1954. She was directed by Sgt. Raford to meet the defendant at the bus stop at the corner of Cameron and Denver. The police were to be on the lookout. When defendant telephoned back the second time she agreed to meet him at the bus stop. Witness said that as she walked from her home and approached the bus stop a car pulled up beside her and the driver honked the car horn. She said the driver was the defendant, Jack Bayouth, but witness kept walking toward the bus stop, and Bayouth drove along slowly and stopped at a stop sign and then drove into Denver and stopped and motioned to her and that she went to the car. Said she:

"He opened the door and said, 'Are you going to town?', and I said, 'I guess so'—he had said in a previous conversation that his name was Bobby, and I said, 'Are you Bobby?' and he said, 'Yes'. Then he said, 'Honey, do I look like you thought I'd look?' and I said, 'I don't know', and he said, 'You aren't going to get in?' and I said, 'No', and I pushed the car door shut and he started driving off."

Witness testified that in her talk with Bayouth there at his car she recognized his voice as that of the man who had telephoned her that morning and at the numerous other times between February and December.

Officer John Cole of the Tulsa police department testified that he had known the prosecuting witness, Mrs. Irene Hamilton, for about a year; that she worked at J. C. Penney's store where he had been a special officer; that she reported a conversation that she had by telephone with some man who had been annoying her for some time by telephoning her; that this was on December 2, 1954; that she was advised that if this man should telephone again that she should agree to meet him if he again asked her and she was to telephone the police department. He said that he was directed on December 3, 1954 to watch Mrs. Hamilton as she would go to the bus stop at Cameron and Denver; that accordingly he watched Mrs. Hamilton leave her home and walk along the sidewalk south on Denver; that he noticed a green 1953 Chevrolet coach approach as she entered the block at Elwood, the car was being driven very slowly and the driver was "beeping" his horn at Mrs. Hamilton, but that she proceeded to the bus stop and stopped and that the driver of the Chevrolet made a right hand turn south on Denver and pulled into the bus stop and talked with Mrs. Hamilton and then she closed the car door and started walking down the sidewalk south from the bus stop and the driver started to drive on, but saw witness and then backed his car up in the bus stop and came over to his car. Witness stated:

"He said, 'Officer, this lady is trying to get me in trouble', and I said, 'Yeah—how?' and he said, 'She was supposed to meet me down here this morning and here she is trying to get me in trouble—she has the police here.' I said to him, 'What makes you think she is going to get you in trouble?' and he said, 'She just is; she has been talking to me over the phone and said she would go out with me and I met her like we agreed and she's got the police here.'."

Witness said about this time Mrs. Hamilton walked back and he asked her to go telephone the department, but that while she was making the call, officers John Murray and Murry Smith drove up and witness placed the defendant under arrest and told him they would have to take him to headquarters. He turned the defendant over to officer Murray.

Officer Murray testified to going to Denver and Cameron, Tulsa, on December 3 at about 10:15 A.M. and taking defendant Bayouth into custody and taking him to the police station at Fourth and Elgin. On the way he said that the defendant talked. Said he: "Bayouth stated that he didn't see anything wrong trying to get a little strange stuff." Witness said defendant admitted having telephoned Mrs. Hamilton that morning.

Concerning the conversations previous to December 3, 1954 that Mrs. Hamilton had by telephone with the voice she identified as that of the defendant, she testified that in February the first time he called her, as to the conversation:

"Q. What was that conversation? A. It was very brief. I answered and he said, 'Hi, Sleepy-head'. I said 'Who is calling?' and he said, 'Your best boy friend', and I asked again who it was and he said, 'You don't know—is the old man there?' and then he said, 'Were you still in bed?' and I said, 'No', and he said, 'I bet you haven't been up long enough to have your panties on', and then I hung up."

Witness stated that about a month later she received a second call and that she hung up; that he would usually telephone about 10 o'clock in the morning and would say, "Hi, Sleepy-head". She said that she possibly received a half dozen calls between February and November, 1954. She said that the first call made in which the one calling called her by name was Sunday, November 21, 1954. That is when she first informed the police about the calls. Witness said:

"That was on Sunday morning, when he called at 7:30 and he said, 'Mrs. Hamilton?' I said 'Yes', and he said, 'Did I get you up?' and I said, 'No'. Then he said, 'How are you this morning?' and I said 'Fine', and I said, 'Who is this?' and he said, 'Is the old man there?' and I said, 'He is in bed, I will call him', and he said, 'I don't want to talk to him', and I said, 'I will call him anyway'; and then he said, 'Yesterday you had white panties on', and I said, 'What difference does

that make', and he said 'I have watched you a long time—I like you a lot and you wear white underclothes.' Then he said, 'What happened last night after you went to bed?' and I said, 'Nothing', and he said, 'Are you sure the old man didn't * * * [too vile to print] you?' those were his words."

Witness further said that the man telephoning had said, when she asked who was telephoning: "You don't know", and "This is your best boy friend." She said she reported this to the police.

On Thanksgiving morning the voice she identified as that of defendant called by telephone. Said she:

"It was 7:30, and he wanted to know if I could meet him and I said, 'No', and he asked why, and I said I had to put the turkey in the oven, and he said, 'If I could meet you, could we have intercourse?' and I said, 'Who is this?' and he said, 'You don't know'; then I asked, 'Where are you?' and he said, 'At home' and then I hung up and called the police and talked to Sgt. Lang."

As to the December 2, 1954 call, witness testified:

"He wanted to know what I was doing, and I said, 'Getting ready to go to work', and he said, 'It won't hurt if you are a little late', and then he asked where I worked, and I didn't say. Then he described himself as 5 feet 11 inches tall, and weighing between 155 and 160; black curly hair and brown eyes and said his name was Bobby and that he lived in an apartment with his wife. Then he asked if he gave his wife something to drink—not to get her plumb drunk—if I would come over and beat her up, and asked how I would do it. He asked how big I was and how much I weighed and if I was strong, and if he could have intercourse with me in front of his wife. Q Did he say anything else? A I asked who it was, and he told me he had parked in front of my house the night before and he said, 'do you have a little boy 7 or 8 years old?' and then

he said, 'Last night at 15 of 10 this boy came out on the porch', and I said, 'Are you sure it was my porch?' and he asked if I would leave my shade up so he could see me undress. He asked me if I needed anything and said he could write a check for any amount, and he asked me if I was afraid to ask for a divorce. Q What did you say? A I told him I was afraid. Q What did you say you told him? I didn't tell him I was going to get a divorce—I said I was afraid to."

Witness further stated that she recognized the voice as that of defendant when she met him on December 3; and that defendant further asked her by telephone in the conversation on December 2 if her husband was mean to her or beat her; that he asked her if she needed anything and said, "I will call you, and my check is good for any amount and I will send it to you."

Whether the evidence was sufficient to make out a case depends upon the definition of the term "prostitution" and the term "lewdness" as set out in Section 1030 of Title 21, hereinabove quoted as well as the terms and meaning of other words in the charging statute [1029].

We have seen that by Section 1030 it is provided that "the term 'lewdness' shall be construed to include the making of any appointment or engagement for prostitution or lewdness or any act in furtherance of such appointment or engagement."

Here there was evidence that defendant by telephone on two occasions solicited Mrs. Hamilton to have sexual relations with him, and on December 2 in furtherance of his effort to "entice" her offered to furnish her money, aid her in getting a divorce if she wanted one, and told her that his check was good for any amount. He had previously conversed with Mrs. Hamilton in a lustful vein by mentioning the kind of underclothing he thought she wore, interposing the thought that her husband had intercourse with her on a certain night, except that he used the most vulgar and concupiscent term to express himself. He wanted her to leave the window shade up so that he could see her undress, etc.

Clearly defendant solicited the prosecuting witness and for hire. He endeavored to draw on by exciting desire; by tempting, to lead astray; to induce to evil.

But it is claimed that to have "enticed" Mrs. Hamilton implied that she yielded assent as the result of the enticing. An early Federal case, United States v. Ancarola, C.C.N.Y., 1 F. 676, 683, is cited as supporting such proposition.

■ The general accepted definition is broader than the narrow definition sought and is expressed in Black's Law Dictionary and other standard works. In Black's, "entice" is defined as "to wrongfully solicit, persuade, procure, allure, attract, draw by blandishment, coax or seduce." See City of Portland v. Stevens, Or., 178 P.2d 175; Webster's New International Dictionary, Roget's Thesaurus.

The term is defined in 30 C.J.S., p. 262, as "A term variously defined as meaning to allure, especially in a bad sense; to attract; to coax; to draw on; to incite; to induce or persuade a person to do a thing; to induce to evil; to instigate by inciting, or exciting, hope or desire; to lead astray; to lure; to persuade, procure or solicit; to seduce; to tempt."

■ We conclude that the court did not err in overruling defendant's demurrer to the State's evidence.

■■ Counsel for defendant moved to suppress the State's evidence, arguing that the discovery of the identity of the defendant and his arrest were brought about by entrapment. The court overruled the motion but counsel did not reserve an exception. The grounds for the motion are not valid as defendant was not induced by the officers nor Mrs. Hamilton to make the proposals recited. See Lee v. State, 66 Okl.Cr. 399, 92 P.2d 621, we said, in part:

"Entrapment is the planning of an offense by an officer, and his procurement by improper inducement of its commission by one who would not have perpetrated it, except for the trick-

ery or fraud of the officer." See, also: Beasley v. State, Okl.Cr., 282 P.2d 249.

■ It is urged that the court erred in permitting improper cross-examination of the defendant by the county attorney. Particularly where the county attorney had asked defendant, "Are you in the habit of picking up or attempting to pick up girls at bus stops?" Whether this would be error would depend of course on the defendant's prior testimony. We have particularly studied that portion of the record where the question appears.

The defendant had testified that he was 26 years of age, was not married; claimed that he first telephoned prosecutrix about November 15, 1954; that he had gotten her number from a salesman. He claimed that she told him that she did not get along well with her husband. He said: "Well, after she told me she didn't sleep with her husband, I figured she was a whore and that I would go out and get a little of this stuff." He claimed that prosecutrix never did tell him not to call her any more. He said that he never offered her money, but when she asked him if he had money he told her that he did. He said that he telephoned her more than six times. He said that he did not know the name of the woman called as he just had her telephone number.

On cross-examination counsel for the State asked: "Are you in the habit of making anonymous calls? Defendant claimed that he never had before. Defendant had also told about honking his car horn at Mrs. Hamilton the morning of December 3 as she had promised to meet him. The county attorney then asked him whether he was in the habit of picking up, or attempting to pick up, girls at bus stops. Defendant said, "I refuse to answer the question." The court directed the witness to answer, and he said that since the occurrence with Irene Hamilton he had been staying at home. Of course picking up a girl at a bus stop under innocent circumstances could not be condemned, but the question was provoked by defendant's open admission of his purposes in telephoning Mrs. Hamilton, but he demonstrated knowledge

that what he was doing might lead to serious trouble, having learned that she was married, because he claimed that every time there was a call, that Mrs. Hamilton would tell him to call back, or call tomorrow, but that he was too wise to place himself "in jeopardy" by calling when she said to call. He said, "I am not so bad looking that I have to be calling around". He demonstrated no sense of guilt in his efforts to break in on the married life of a couple. We think that under the circumstances the trial court did not abuse his discretion in permitting the questions complained of.

The defendant urges that his requested instructions 1, 2 and 3 should have been given. These instructions covered his theory advanced in the propositions heretofore urged and where we have held adversely to him and no purpose would be served in comments that would be repetitious of what we have already said.

■ Defendant next complains of the instructions actually given by the court, Nos. 3, 4, 5 and 7. He did not reserve an exception to the giving of any of these instructions, and of course, the rule is that where no objection is taken to the instructions of the trial court, such instructions will not be examined by this court for the purpose of discovering other than fundamental error. Green v. State, 70 Okl.Cr. 228, 105 P.2d 795; Miller v. State, 94 Okl. Cr. 297, 235 P.2d 552.

■ Instruction No. 3 was not mentioned in the motion for new trial. We have said that alleged errors occurring during the progress of a trial and not raised and presented to the court below, will not be considered on appeal. Nowlin v. State, 65 Okl.Cr. 165, 83 P.2d 601; Jackson v. State, 86 Okl.Cr. 420, 193 P.2d 895; appeal denied 335 U.S. 806, 69 S.Ct. 24, 93 L. Ed. 363, certiorari denied Jackson v. Burford, 338 U.S. 888, 70 S.Ct. 184, 94 L.Ed. 545.

■ We find that instructions 3 and 4 are statutory, involving Section 1030, supra, and that the defendant made no request for further instructions upon the subject covered by said instructions, and from what

we have already said concerning the section of the statute in question, § 1030, Tit. 21 O.S.A., affirms our conclusion that we find no lack of jurisdiction on the part of the court or error of a fundamental character. State v. Gray, 71 Okl.Cr. 309, 111 P.2d 514.

■ Instruction No. 7 given and now complained of reads:

"You are instructed that if you find and believe from the evidence, beyond a reasonable doubt that the defendant, in Tulsa County, Oklahoma, and on the 2nd day of December, 1954, and prior to the presentment of the information in this case, did unlawfully, wilfully, wrongfully and knowingly entice Irene Hamilton to commit an act of lewdness with him in the following manner, to-wit: by calling the said Irene Hamilton on the phone and asking her to have sexual intercourse with him and did promise the said Irene Hamilton money if she would have sexual intercourse with him, then you should find the defendant guilty.

"On the other hand, you are instructed that should you fail to so find, or should you entertain a reasonable doubt thereof, then you should acquit the defendant."

Likewise, from what we have heretofore said concerning the statutory provisions in question, we find no error in the court giving instruction No. 7.

■ Counsel objected to instruction No. 5, defining the word "entice". This quotation was taken directly from Webster's New International Dictionary, and we find no error in the definition given.

The court gave defendant's requested instruction No. 4, being No. 6 as given. This was done apparently by reason of defendant's testimony that the prosecuting witness lead him on in making the proposals that he did, and if he violated the law, which he denied, that she was an accomplice. That instruction reads:

"You are further instructed that if you find from the evidence that Irene Hamilton was an accomplice in the commission of the offense charged, if any, and find that such evidence on her behalf is uncorroborated by additional proof or evidence, then it is your duty to acquit the defendant.

"However, if you find and believe that the witness did not voluntarily consent to the alleged illegal act, then she does not become an accomplice and it is not necessary for her testimony to be corroborated."

■ The jury did not believe the defendant. This was a question of fact and within the province of the jury to determine, and its finding will not be disturbed on appeal, where the evidence was conflicting. Toms v. State, 95 Okl.Cr. 60, 239 P.2d 812; Campbell v. State, 95 Okl.Cr. 396, 247 P.2d 281; Lyons v. State, 94 Okl. Cr. 288, 234 P.2d 940.

As a final proposition counsel assert that the court erred in failing to give the jury an instruction concerning the "admission of evidence of other crimes in connection with the identity of the accused."

■ The record, as we have seen, disclosed that the prosecuting witness had received between the month of February, 1954 and December 2, 1954, a number of telephone calls in which the theme was not merely erotic, but was concupiscent or lustful in nature. And although the defendant had one time prior to December 2, 1954 asked Mrs. Hamilton by telephone to have intercourse with him, it was not until the 2nd day of December, 1954 that he offered her money to lure her on. He denied this, but the jury did not believe him. Although the telephone calls prior to December 2, 1954 might have amounted to a breach of the peace, they did not violate the terms of Section 1029, of Title 21 O.S.A., as defined by Section 1030 of the same Title, as he had not previously as an allurement offered her money.

Instruction No. 7 given by the court and heretofore quoted, limited the jury to the offense as charged on December 2, 1954.

It was the contention of counsel at trial that none of the telephone calls of themselves constituted a criminal offense. No instruction as suggested was requested and no complaint in this regard was registered in the trial court. The defendant in testi-

fying said that he had telephoned Mrs. Hamilton more than six times. He did not recognize his conduct as being wrong from any standpoint.

We note that the jury left the punishment to the court, and that they evidently could not agree upon assessing the maximum penalty. This being the first conviction of the defendant, and the punishment assessed by the court being the maximum, it is the thought of this court, in view of the record as a whole, that justice would be served by reducing the penalty from 12 months to six months in the county jail, and the judgment appealed from as so modified is affirmed.

JONES, P. J., and BRETT, J., concur.